James Emmons DAVIS, Appellant,

v.

Clella L. CHISM, Appellee.

*Clella L. CHISM, Cross-Appellant,*

v.

James Emmons DAVIS, Cross-Appellee.

Nos. 1482, 1485.

Supreme Court of Alaska.

Aug. 13, 1973.

476

Lyle R. Carlson, of Merdes, Schaible, Staley & DeLisio, Fairbanks, for James Emmons Davis, appellant, cross-appellee.

James R. Blair and Lloyd I. Hoppner, of Rice, Hoppner, Blair & Associates, Fairbanks, for Clella L. Chism, appellee, cross-appellant.

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

CONNOR, Justice.

These appeals arise out of a personal injury action brought by Clella L. Chism against James E. Davis. Questions are raised about the admissibility of certain evidence at trial and about the application of Alaska Civil Rule 68 to offers of judgment.

Mrs. Chism brought suit against Davis for injuries resulting from a May 17, 1968, automobile collision in the area of Fairbanks, Alaska. Summary judgment was granted for plaintiff on the question of Davis' liability, and a jury trial was had only on the issue of damages. The jury returned a verdict in favor of Chism in the amount of $18,000. Judgment was entered in the amount of $27,010.61, which sum included pre-judgment interest, costs, and attorney's fees.

At trial Chism testified that after the accident her back was trembling and jerking, but that she did not believe she was seriously hurt. Several people at the accident scene asked her if she wanted to be taken to the hospital, but she replied that she was not hurt and did not want to go to the hospital.

Subsequently, she began to feel increasingly sore, and three days following the accident she went to see Dr. Weston. She believed she had merely sore muscles. Dr. Weston took x-rays and prescribed a muscle relaxant. Chism testified that Dr. Weston could not find anything wrong. The muscle relaxants did not relieve her pain, and she began to think her pain was caused by more than sore muscles. Several days after seeing Dr. Weston, she visited Dr. Lindig, complaining of pain in her arms, hip and back. Dr. Lindig examined her, took x-rays, prescribed pain killers, tranquilizers, and physical therapy in the form of home exercises. She continued to see Dr. Lindig until the end of July 1968.

A month later she saw Dr. Schaible, thinking that her back pain might be the result of a kidney problem. Dr. Schaible took x-rays and gave her some medication for a urinary tract infection. The next physician she saw was Dr. Mead, a neurosurgeon in Anchorage. Following that, she saw Dr. Hanns in Fairbanks. Finally, in November of 1969 she went to Seattle to see Dr. Klemperer. Klemperer examined her and took a myelogram. The myelogram indicated some irregularity in the L-4/L-5 region of her spine. Klemperer performed surgery on her back in November of 1969, removing the disc between L-4 and L-5.

Mrs. Chism testified that for a short time following the surgery her condition improved, but then began to deteriorate. At the time of her trial she was still suffering from pain in her back, pain in her right hip which radiated down her leg, and pain in her shoulder. She testified that she was no longer able to dance, hunt, fish, or walk for more than about one block. She also testified to having difficulty performing her housework.

Dr. Lindig testified on Chism's behalf. He stated that he examined her several days after the accident, finding that she had a near full range of back motion and no tenderness on palpation of the back. An examination several weeks later still showed full range of motion in the back, but now there was tenderness in the lumbar muscles. His original diagnosis was contusions and sprains of muscles and ligaments in the back and injuries to soft tissues. Two weeks prior to trial Dr. Lindig examined Chism again. He noted that a laminectomy had been performed, and diagnosed her complaints at that time as soft tissue damage and damage to joint structures in the lower back. He found it diffi-

cult to say how much of this damage was due to the accident and how much was due to scar tissue formation following surgery. He did, however, give an opinion that Chism's problems were the result of the 1968 collision and that those problems would be permanent.

Davis' defense focused on attempts to discredit Chism's veracity and to discredit Dr. Lindig's opinion that Chism's present condition was the result of the accident. The defendant offered into evidence the deposition of Clint Boehler. During the summer of 1969, Boehler worked in the Fairbanks area as an undercover agent for the Alaska State Troopers. In his deposition, he related that Chism and a female companion had approached him at the Steak Pit and had solicited an act of prostitution. After alerting two troopers, Boehler met Chism and her friend in a hotel room at the Polaris Apartments.

He testified that the friend got into bed, Boehler got in next to her, and Chism climbed over both of them, apparently without any pain, and got into bed. Soon thereafter the two troopers entered the room. One trooper tried to take photographs. Boehler described Mrs. Chism's efforts to keep the trooper from taking photographs and also described her strenuous efforts to resist being arrested, as well as a scramble for the $100 that Boehler had given the women for their services. Boehler further testified that the charges against Chism were dismissed because he was out of state and unable to appear and testify against her. He also stated that while he was waiting for the troopers to arrive, he had sexual intercourse with both women.

The deposition was offered for the purpose of rebutting Chism's testimony that after the accident she was in a weak condition, and was unable to perform household chores with ease or to engage in strenuous physical activity generally. Counsel for the defense also argued that the deposition was relevant to the issue of diminished earning capacity. The trial court found that the deposition had only a minimal relevancy since the arrest situation was one of extreme stress and Chism's actions under such circumstances would not be indicative of her normal physical abilities. The court found that the prejudicial effect of this testimony far outweighed its probative value.

Over objection, defense counsel was permitted to ask Chism whether or not she had ever been convicted of a crime, other than minor traffic offenses.[1] She answered that she had. She also admitted that she had been convicted on three separate charges in Nevada. Defense counsel did not inquire into what the charges were, but on redirect examination Chism's attorney asked her what the charges were. She stated that the Alaska conviction was for indecent exposure or exhibitionism in Alaska in 1960, and that she was convicted of two charges of vagrancy and one charge of resorting to a hotel for purposes of sexual intercourse, all in Nevada in 1961.

The defense introduced into evidence the deposition of Dr. Lindahl. Over objection, Lindahl testified, in response to a hypothetical question, that in his opinion it was unlikely that the accident of May 17, 1968, would have caused the disc problem, because the physicians who examined her after the accident made few physical and neurological findings that would indicate

---

1. Before admitting this evidence, the trial court heard Davis' offer of proof. Davis' counsel indicated that he had certified records of convictions in Alaska and Nevada. He stated that he was offering evidence of the convictions to impeach Mrs. Chism's prior statement in her deposition that she had been convicted of a crime on only one occasion. The trial court ruled that Mrs. Chism could be asked if she had ever been convicted of a crime and how many times. The court specifically ruled that defense counsel could not ask her what the crimes were. These questions were asked, but counsel did not mention the statement from her deposition or make any attempt to impeach her with that prior inconsistent statement.

such a problem. Chism's counsel objected to the hypothetical question that elicited this response on the ground that the question included a crucial fact not in evidence: that Dr. Weston had made no positive findings, i. e., that Dr. Weston had attempted to find but had not found any evidence of a disc problem.

Over objection, the defense was permitted to ask the medical experts whether or not a chronic inflammatory pelvic disease could cause low back pains. The doctors all answered affirmatively. Over further objection, the court permitted the defense to call Dr. Schaible. Following an offer of proof, Schaible was permitted to testify that he had treated Mrs. Chism for gonorrhea in 1962 and 1963. In 1963 he also removed one of her fallopian tubes following an ectopic pregnancy. At the time of the surgery he noticed adhesions in the pelvic area and a thickening of the fallopian tubes which he attributed to the chronic inflammatory pelvic disease (gonorrhea). In his opinion, while acute gonorrhea could be cured, there were residual effects when the disease had progressed beyond a local infection, and that these residual effects caused low back pains in most women.

Following the jury's verdict, the defendant moved for costs and attorney's fees. This motion was based on an offer of judgment submitted to plaintiff before trial in the amount of $20,000 plus costs, which offer the defense claimed was more favorable than the $18,000 verdict. The trial court denied the motion and awarded costs and attorney's fees to the plaintiff.

*Admissibility of the Boehler Deposition*

■■ Unquestionably the trial court in civil cases has discretion to determine whether the probative value of evidence may be so outweighed by its prejudicial effect as to render the evidence inadmissible.[2] The question before us is merely whether the record shows a clear abuse of discretion.[3] Applying the test to this issue, it is most difficult to say that the trial court clearly abused its discretion in excluding the deposition from evidence.

■ At least a portion of the Boehler deposition had some relevance in contradicting plaintiff's testimony as to her inability to perform certain physical tasks without pain. However, as the trial court noted, only a very small part of the deposition contained any reference to plaintiff's physical abilities, and Boehler observed plaintiff acting in a highly stressful situation. Balancing probative value against the prejudice that would have resulted from permitting the jury to hear the details of plaintiff's sexual escapades, we are satisfied that the court properly exercised its discretion to exclude the deposition.

2. Alaska Civ.R. 43(b) provides in part: "The admissibility of evidence shall be governed by these rules, or in the absence of rule, by the principles of common law as they may be interpreted by the courts of the state *in the light of reason and experience.*" (Emphasis added.)
See also C. McCormick, Law of Evidence § 152, at 320 (1954). Rule 303 of the Model Code of Evidence (A.L.I.1942) provides in part:
"(1) The judge may in his discretion exclude evidence if he finds that its probative value is outweighed by the risk that its admission will
. . . . .
(b) create substantial danger of undue prejudice . . . ."
The comment to that rule states:
"The application of this Rule should depend so completely upon the circumstances of the particular case and be so entirely in the discretion of the trial judge that a decision in one case should not be used as precedent in another." Model Code of Evidence at 182.

3. Nordin Constr. Co. v. City of Nome, 489 P.2d 455 (Alaska 1971) (denial of motion for post-judgment relief); Hart v. Wolff, 489 P.2d 114 (Alaska 1971) (attorney's fees); City of Fairbanks v. Nesbett, 432 P.2d 607 (Alaska 1967) (determination of qualifications of expert witness); Gravel v. Alaskan Village, Inc., 423 P.2d 273 (Alaska 1967) (granting post-judgment relief); Australaska Corp. v. Sisters of Charity of House of Providence, 397 P.2d 966 (Alaska 1965) (refusal to take judicial notice of particular matters).

Davis argued that the deposition should have been admitted because it was his only non-medical evidence that rebutted plaintiff's case. But a defendant's failure to discover or produce other evidence for his cause is not an independent justification for admission of the evidence he does offer.

### The Offer of Judgment

Alaska Civil Rule 68 provides in pertinent part:

"At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against him for the money or property or to the effect specified in his offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer. The fact that an offer is made but not accepted does not preclude a subsequent offer."

In this case, in addition to the jury's verdict of $18,000.00, the trial court awarded pre-judgment interest of $3,033.66. The total amount of $21,033.66 exceeded the amount of the offer of judgment which had been served by defendant. That offer stated in relevant part:

"Defendant, pursuant to Civil Rule 68, hereby offers to allow entry of judgment for plaintiff in this action for $20,000 plus costs to date hereof."

■ Davis seems to concede that the phrase "judgment finally obtained by the offeree" is to include the amount assessed as pre-judgment interest, but argues that pre-judgment interest must also be tacked on to an offer of judgment if the offer is accepted. It is claimed that the trial court erred in comparing the jury's verdict plus pre-judgment interest with the defendant's offer of judgment without similarly computing and adding to it pre-judgment interest. While this argument has some initial appeal in that it is symmetrical, upon closer analysis, it is unpersuasive.

Rule 68 provides that if the offer is accepted, judgment is to be taken against the defendant "for the money . . . specified in his offer, with costs then accrued." Rule 68 also provides that after an offer of judgment is accepted and the offer and notice of acceptance filed, the clerk shall enter judgment. Since the rule also contemplates that costs which have accrued up until the time of the offer shall be in addition to the amount specified in the offer, it must be assumed that costs are to be taxed after entry of judgment in the same manner as provided for in Civil Rule 58:

"The entry of the judgment shall not be delayed for the taxing of costs, but a blank space may be left in the form of judgment for insertion of costs by the clerk after they have been taxed."

These provisions imply that the clerk must enter judgment only for the amount specified as having been offered and accepted and do not by their terms permit the clerk to compute and add pre-judgment interest.

On the other hand, Civil Rule 58 also provides that

"[u]nless the court otherwise directs . . . judgment upon the verdict of a jury shall be entered forthwith by the clerk; . . ."

Thus it could be claimed that the trial court erred in adding pre-judgment interest to the jury's verdict before entering the judgment.

■ Chism argues that pre-judgment interest is in the nature of compensatory damages, and therefore should be included in ascertaining the amount of the "judgment finally obtained". Our opinion in

State v. Phillips, 470 P.2d 266 (Alaska 1970), does not make clear whether we regarded pre-judgment interest as being in the nature of damages, but that conclusion may be inferred from the rationale of *Phillips*. The reason for awarding pre-judgment interest is that money is worth less the later it is received. Plaintiff is entitled to the amount to which he has been damaged by the defendant from the date his cause of action accrued. Thus it may be argued that plaintiff was entitled to the use of that amount from the same date, and the use of that money has real economic value, of which the plaintiff has been deprived. In this sense, pre-judgment interest is necessary to compensate the plaintiff, not only for the amount by which he has suffered damages in the usual sense but also for the loss of use of the money to which he has been entitled.

 Because pre-judgment interest is in the nature of compensatory damages, it is reasonable for the trial court to include that figure in the "judgment finally obtained by the offeree" and to compare that total to the amount of the offer of judgment. By the same token, it seems reasonable to conclude that an offer of judgment that contains only a single figure (plus costs) would include all sums which the defendant believes will fairly compensate the plaintiff for all damages sustained, including the damage resulting from deprivation of the use of the money between the date the cause of action accrued and the date of the offer.

██ Although Rule 68 of the Federal Rules of Civil Procedure is substantially similar to Alaska's Civil Rule 68, this precise question does not seem to have arisen in the federal courts. The federal cases cited by Chism are not particularly helpful. However, it is clear under the federal cases and commentary that an offer of judgment must specify a definite sum and must be unconditional.[4] This is, of course, basic contract law. An offer of judgment and acceptance thereof is a contract. The amount of the offer of judgment must be definite so that it is clear the parties have come to a meeting of the minds on an essential term of the contract.

██ ██ Chism has argued that pre-judgment interest is not an automatic award, but may be withheld if such award would cause an injustice.[5] Thus, if pre-judgment interest may or may not be added to an offer of judgment, the amount of the offer cannot be definite. This argument has some merit, since the offer of judgment and the acceptance, if any, are made privately between the parties. Thus, a judge would have no opportunity before an offer is accepted to determine whether or not pre-judgment interest should be awarded in the case. Of course, the language in the *Phillips* case quoted in footnote 5 hereof implies that in only the most unusual case would pre-judgment interest not be proper. There would nevertheless be an element of doubt in any offer of judgment unless the offer clearly specified whether pre-judgment interest were included. Further, since the amount of the offer of judgment originates with the defendant, he would certainly be in a position to decide at the time he makes the offer whether he thinks pre-judgment interest would work an injustice to him.

A defendant is free to make successive offers of judgment until 10 days before the commencement of trial. He may take into account in a subsequent offer the interest that has accrued since the previous offer. Davis contends that this is not a reasonable solution since "a plaintiff's attorney's accepting an offer of judgment several

4. Tansey v. Transcontinental & Western Air, 97 F.Supp. 458 (D.D.C.1949); 3 Barron & Holtzoff, Federal Practice and Procedure § 1471, at 521 (Wright Rev. 1958); 7 J. Moore, Federal Practice § 68.04, at 68–9 (1972).

5. In State v. Phillips, this court stated: "All damages . . . should carry interest from the time the cause of action accrues, unless for some reason peculiar to an individual case such an award of interest would do an injustice." 470 P.2d at 274.

weeks or months old would be depriving his client of interest naturally accumulating since the last offer was made." But Rule 68 provides that offers of judgment must be accepted within 10 days after the service of the offer. Thus, 10 days of interest is the most that the plaintiff could lose by timely acceptance.

In our view pre-judgment interest is in the nature of compensatory damages. We hold that an offer of judgment that specifies only a total sum must be construed as including the defendant's assessment of all of the damages that plaintiff is entitled to, including that occasioned by the loss of use of the money. We find this to be the preferable solution. Once an offer of judgment has been accepted, the trial court should have to make no further determinations that might require extensive factual findings.[6]

By our holding, some certainty in the operation of Rule 68 will be achieved. Both parties will know at the time of the offer that the amount specified is all that the plaintiff will receive in the way of damages and all that the defendant will be liable for.

*Admissibility of Dr. Schaible's Testimony Regarding Plaintiff's Gonorrhea*

Doctor Schaible testified first out of the presence of the jury on an offer of proof. He testified essentially as follows: In 1961 and 1962 he treated Mrs. Chism for gonorrhea. In 1963 he performed surgery on her, removing one of her fallopian tubes. At that time he noted adhesions in the pelvis indicating chronic inflammatory pelvic disease. Except during the visit in August of 1968, she made no mention of any backache. Schaible testified that

chronic inflammatory pelvic disease "usually causes backaches", the backache could appear "years later" after the acute infectious stage of the disease has been cured. He also testified that the type of pain that accompanies chronic inflammatory pelvic disease is a

"dragging type of pain . . . not the type of pain you'd get with a disc protrusion or an injury to the back. There usually isn't the amount of spasm and the reflexes are usually normal. There's no limitation of motion on that type of backache."

Schaible also testified that when he examined Mrs. Chism in 1968 he disagnosed her problem as a urinary tract infection because in addition to backache she complained of frequent urination, pain over the pubic area and the right lumbar area. Schaible testified that he had not thought of gonorrhea as a cause of her complaints at that time.

The trial court permitted the evidence to be presented before the jury on the ground that it had "some probative value to show that this is a consideration for the problem she['s] having now." On direct examination Schaible testified approximately as he had on *voir dire*. On cross-examination he was asked a detailed hypothetical question:

"Q. Now Doctor, I want you to assume a few things. I want you to keep in mind the contacts you had with her and the examinations you've made of her, and the treatments that you've given her, prescribed for her. [Mrs. Chism's history of gonorrhea and its treatment.] Now I also want you to assume that in 1966, December, while she was scrubbing out her bathtub, when she raised up she felt something in her back that caused

6. Determination of proper attorney's fees can on occasion require a certain amount of fact finding. Normally the attorney's fees which would be added to the amount of the offer of judgment, as part of the costs, would be computed under Civil Rule 82 on either a non-contested or without trial basis.

We note that the pre-judgment interest which had accrued at the time of the

offer in this case was about $2,250. This, when added to the damages ultimately recovered, is $520 in excess of the $20,000 offer. We think that the date of the offer, and not the date of the ultimate judgment is the critical time in determining whether the offer, including pre-judgment interest, was sufficient.

her some pain. She felt a catch or a pop and that she went to a chiropractor on three occasions. The chiropractor manipulated her, twice giving her relief and once not giving her relief. I want you to assume that in May or June of 1967, she saw an orthopedic surgeon who examined her and at that time she had low back pain and she had some radiation and down the right leg. I want you to assume that in May of 1968 that she was involved in an automobile accident and that shortly after the accident, within a few days she developed symptoms of pain in the low back, in the lumbar area, that radiated into the right side, that affected her right hip and her right leg, and that she saw a number of physicians over a period of about a year and a half for this condition with the symptoms steadily worsening. I want you to assume that in November of 1969 that Dr. Klemperer in Seattle conducted a myelogram test on her and the myelogram showed that she had a deficit between L–4 and L–5 to the right. That surgery was performed on her at that time, a laminectomy and that upon opening her up Dr. Klemperer found a moderately bulging or herniated disc between L–4 and L–5 on the right side and removed it. I want you to assume that immediately following surgery she had relief from the pain in her back and her right leg and that this relief continued for a period of about six weeks, at which time she started to have her symptoms come back on her and they degenerated into a condition within a few months where she was essentially back to where she was before the surgery and that from that time until now, she has back pain on the right side in the lumbar area radiating into the hip, right hip and in the right leg. And add to that the assumptions that following the automobile accident that she had no demonstrable spasm in her back, that she had no nerve deficits until the time shortly before her surgery. When Dr. Klemperer examined her and she demonstrated some neural deficits at that time. Based upon these assumptions and your examination and findings of her, do you have an opinion as to reasonable medical certainty, reasonable probability, as to what is causing her problem today?"

He testified that, based on these assumptions, he would say that an injury, i.e. one of the traumas, caused Mrs. Chism's present complaints. But he could not say whether the bathtub incident or the automobile accident was the specific cause of her present complaints.

Mrs. Chism has cited Maddocks v. Bennett, 456 P.2d 453 (Alaska 1969), in support of her argument that the testimony concerning the possible effect of the gonorrhea on her present symptoms should have been excluded. In *Maddocks* this court was called upon to rule on the degree of certainty required in a medical expert's opinion, and held that a medical opinion based on "reasonable probability" was sufficiently certain to have probative value and was properly admitted by the trial court. In concluding that the proffered opinion must be supported by probabilities rather than mere possibilities, we adopted the test we had previously applied to govern the amount of medical proof required to sustain damage awards. We chose that test in *Maddocks* because the medical testimony in question constituted plaintiff's entire case with regard to medical causation. The cases discussed in *Maddocks* all dealt with the situation where medical opinion is offered to prove plaintiff's case as to either causation or damages.

Davis argues that a different standard should be applied where the defense attempts to weaken plaintiff's case by offering medical testimony that some other disorder might have caused the result in question. Although Davis does not develop this argument, it seems clear that Dr. Schaible was not called to give an opinion as to the cause of Mrs. Chism's condition. He was called to cast doubt upon the factual basis underpinning Dr. Lindig's and Dr. Klemperer's opinions as to the cause of

her condition. Neither Lindig nor Klemperer apparently had considered or knew of Mrs. Chism's chronic inflammatory pelvic disease, although Lindig did state on cross-examination that such disease would cause back pains. Thus, our concern here is not with the amount of certainty required to give a medical opinion probative value, but with whether it was proper for the court to permit extrinsic evidence to impeach Lindig's and Klemperer's testimony as to what had caused plaintiff's condition.

Wigmore states:

"The data on which an expert rests his specific opinion (as distinguished from the facts which make him skillful to form one at all) may of course be fully inquired into upon *cross-examination*. Without them, the value of the opinion cannot be well estimated. . . .

"But may the incorrectness or insufficiency of such data be established by *calling other witnesses*? This is permissible and common, without doubt, so far as it involves merely the questioning of other expert witnesses, upon their opinion of the validity of the first witness' grounds; for they are usually called primarily for the sake of their own opinion in the cause, and their discrediting of the first witness' grounds of opinion may incidentally be inquired into without encumbering the issues. For example, when a medical witness, testifying to the cause of death as drowning, states as a ground the presence of froth on the lungs, and then other medical witnesses, testifying to the cause of death, deny that froth on the lungs indicates death by *drowning*.

"But where the confuting of the data given requires the calling of witnesses who would not notherwise [sic] be in the cause, the propriety of this is open to *doubt*. Nevertheless, it may often become highly important for exposing error; and the trial court should have discretion to permit it." IIIA J. Wigmore, Evidence § 992, at 926–27 (Chadbourn

Rev.1970) (Footnotes omitted; emphasis in original.)

There is some basis in the record to indicate that the admission of extrinsic evidence in the form of Schaible's testimony was warranted and would have been helpful to the jury in assessing accurately the opinions of Dr. Lindig and Dr. Klemperer. Neither doctor considered chronic inflammatory pelvic disease in making his diagnosis. Mrs. Chism had no muscle spasm in her back and had nearly full range of motion in her back following the accident. Dr. Schaible testified that there would have been no muscle spasm and that there would have been full range of motion if the backache had resulted from chronic inflammatory pelvic disease. In addition, Dr. Hanns testified that if the accident had been severe enough to damage the disc, he would expect limitation of motion and muscle spasms to appear "within a reasonable time after the injury, days or a few weeks at the most."

On the other hand, Dr. Schaible also testified that the kind of back pain that results from chronic inflammatory pelvic disease is different from the kind of pain of which Mrs. Chism complained. In response to the hypothetical set forth above, Dr. Schaible himself testified that, based on the assumptions made in the question, the cause of Mrs. Chism's complaints would be trauma. Thus, it can be argued that any aid the jury might receive from this extrinsic evidence would be insubstantial and would not justify subverting the policy underlying the exclusion of extrinsic impeachment evidence.

However, as we stated in Haisley v. Grant, 486 P.2d 367, 371 (Alaska 1971):

"In *Maddocks,* we reaffirmed our liberal view favoring the admission of expert testimony if based upon sufficient facts and if the trial judge believes that the jury could receive 'appreciable assistance' from it. In such cases, a ruling admitting expert testimony . . . will not be disturbed on appeal unless an

abuse of discretion is shown." (Footnote omitted.)

The factors favoring either admission or exclusion of Dr. Schaible's testimony do not weigh heavily for either side. Since abuse of discretion is the test on review, we do not find such an abuse here. It was not error to admit the testimony.

### Admissibility of Dr. Lindahl's Opinion

In Maddocks v. Bennett, 456 P.2d 453, 456 (Alaska 1969), the court stated with respect to hypothetical questions that the

"appropriate procedure is to allow immaterial variances to go to the jury with the appropriate cautionary instructions."

Under this rule the jury should determine, with cautionary instructions, what weight to give an expert's opinion. Where an unsupported assumptoin is material to or forms the crux of the hypothetical question, an opinion based on the question should not be admitted. Maddocks v. Bennett, *supra*. The trial court has discretion to determine whether an assumption varies materially from the evidence.[7]

Mrs. Chism contends that the assumption that Dr. Weston made no positive findings was material because Lindahl stated that his opinion was based on the absence of "more physical and neurological findings than were found by the physicians examining her at that time." However, Dr. Lindahl had himself examined Mrs. Chism a month before the trial. He performed a neurological examination and took x-rays. His diagnosis based on this examination was that Mrs. Chism's complaints were of a functional rather than

organic origin. He stated that if her complaints of pain were of an organic cause, he would have expected "weakness in the muscles, decreased or absent reflexes, decreased or absent sensations, and all of these things were not present in this case." In addition, the opinion to which Mrs. Chism has objected refers to a lack of positive neurological and physical findings by "physicians" and not to Dr. Weston alone. Thus, the opinion was also based on Dr. Lindig's findings of good range of back motion, no muscle spasm, normal reflexes and for the most part normal neurological findings.

Dr. Weston did not testify. His deposition was lodged with the court, but not offered into evidence. Davis' counsel apparently impressed the court that the deposition contained testimony that Weston had made no positive findings.[8] Certainly it would not be proper for the trial court to consider testimony not in the record; however, it does not appear that this varaince was material. Mrs. Chism herself testified that Dr. Weston could find nothing wrong with her. In addition, the court in its ruling considered the hypothetical assumption not "critical", and gave a cautionary instruction to the jury at the end of the case. We find no error.

### Admission of Evidence of Conviction of Crime

To recapitulate, defense counsel at one point sought to impeach Chism's statement in her deposition that she had been convicted of a crime on only one occasion. In order to lay a foundation, he was permitted to ask, over objection, whether she had ever been convicted of a crime other than

---

7. In Maddocks v. Bennett, we stated:
 "In summary some courts openly allow discretion to the trial judge to allow hypotheticals with immaterial variances to go to the jury. Most courts state that the facts in a hypothetical question must be supported by some evidence, but they usually mean the material facts. We believe that consistent with the liberal attitude toward expert opinion and hypothetical questions which this court has already adopted, the appropriate procedure is to allow immaterial variances to go to the jury with the appropriate cautionary instructions." 456 P.2d at 456.

8. The court stated:
 "Well, I [am] going to allow it over your objection to this. There is no testimony in this record, but to—if it is not critical, if he did testify along those lines in a deposition, I'm going to allow it."

minor traffic offenses.[9] In response, Chism admitted to having been convicted on three separate charges in Nevada. Inexplicably, once counsel had succeeded in laying this foundation, he abandoned his tack and failed to connect this admission to her prior statement in deposition admitting to only one conviction.

While we consider this sequence of laying a foundation (over objection) only to abandon it immediately as somewhat irregular,[10] we are not persuaded that it amounts to reversible error. First, Mrs. Chism may not have been given an opportunity to explain the inconsistency,[11] but inasmuch as no inconsistency was ever elicit on cross-examination, we fail to see how she was prejudiced.

Second, the jury awarded Chism $18,000. The record indicates that she had special damages of approximately $5,400. Thus the bulk of the verdict was for such intangibles as pain and suffering and future loss of earning capacity, and is not referable to any specific evidence. It is extremely difficult to determine whether or not the jury's verdict reflects some feeling of prejudice against the plaintiff because she had been convicted of crimes on several past occasions. The verdict does not seem to be exceptionally low for the kind of injury Mrs. Chism suffered. The only evidence of indiscretions concerned matters antedating the trial by eight to ten years. It is possible that the jury may have believed Mrs. Chism had a somewhat lurid past but was at the present time leading a respectable life.

From our review of the record we do not believe that the error substantially affected the verdict. Love v. State, 457 P.2d 622, 629–632 (Alaska 1969). In our view the claimed error was harmless.

Affirmed.

9. The court specifically ruled that she could not be asked what the crimes were, inasmuch as impeachment would go only to the number of convictions and not to the substance of the crimes with which she had been charged.

10. Of course, the seasoned practitioner may find that the exigencies of trial force him to abandon a line of questioning when it would be fruitless or damaging to his case to pursue it. Nothing in the record before us indicates that defense counsel weighed such considerations here.

11. Alaska Civil Rule 43(g)(11)(c) provides:

"A witness may be impeached by evidence that he has made at other times statements inconsistent with his present testimony. The statements must first be related to him, with the circumstances of times, places, and persons present, and the witness shall be asked whether he has made such statements and, if so, shall be allowed to explain them. If the statements are in writing, they shall be shown to the witness before he is asked any question concerning them."