George S. HASKINS and Donald Hancock, Individually and d/b/a North Star Equipment Rentals, Appellants,

v.

Carrie A. SHELDEN and Fred Wackwitz, Appellees.

Carrie A. SHELDEN and Fred Wackwitz, Cross-Appellants,

v.

George S. HASKINS and Donald Hancock, Individually and d/b/a North Star Equipment Rentals, Cross-Appellees.

Nos. 2585, 2596.

Supreme Court of Alaska.

Dec. 29, 1976.

C. R. Kennelly and George W. Edwards, Anchorage for appellants/cross-appellees.

Richard D. Savell, Fairbanks; for appellees/cross-appellants.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

ERWIN, Justice.

This civil appeal arises out of a judgment of the Superior Court in a trespass and replevin action. Appeal is taken from the judgment awarding Carrie A. Shelden recovery of an Allis Chalmers tractor and $25,000 in punitive damages to be recovered from appellant George Haskins for his conversion and/or wrongful replevin of the tractor. Plaintiff Shelden has filed a cross appeal challenging the trial court's rulings denying her prejudgment interest on the judgment against Haskins, and refusing to award her attorney's fees according to the schedule in Civil Rule

82(a). We affirm the decision of the trial court as to all matters raised except the award of attorney's fees. On that issue, we remand to the trial court for further proceedings.

In 1964, appellant George Scott Haskins contacted appellee Carrie A. Shelden about possible acquisition of her interest in a group on lode mining claims located off the Steese Highway near Fairbanks. The claims were held jointly by Shelden and Roudolph and Adolph Better. Shelden agreed to sell her interest in the mining claims for $35,000, taking an Allis Chalmers tractor as part payment of the purchase price. A value of $15,000 was placed on the tractor.

The Purchase and Sale Agreement for the mining claims provided that George Haskins was to pay to Carrie Shelden the agreed purchase price of $35,000, of which between $1,500 and $2,500 was to be paid on or before December 15, 1964. Haskins was also to deliver to Shelden a Bill of Sale for the HD–20 Allis Chalmers tractor. The balance of the purchase price was to be paid in three equal installments payable on October 1 of 1965, 1966 and 1967. While the payments were being made, Haskins was to have possession of the mining claims. Upon completion of the payments, Carrie Shelden was to deliver to Haskins a quitclaim deed transferring to him all of her interest in the claims. At the heart of this dispute is the extent of the interest that the parties intended to be transferred.

The Agreement which was introduced into evidence at trial originally had provided that Shelden was to deliver a quitclaim deed for a one-half undivided interest in the claims. The words "a one half undivided" were lined out and the word "her" inserted above the line. The interlineation is followed by the initials "CS." Whether the interlineation was performed at the signing of the Agreement or subsequently when Carrie Shelden discovered that she did not have a one-half undivided interest was in dispute at trial.

Following the signing of the Purchase and Sale Agreement, George Haskins executed a Bill of Sale to Carrie Shelden for the HD–20 Allis Chalmers tractor. The Bill of Sale set forth guarantees by Haskins that he was the owner of the tractor, that it was free from encumbrances, that he had a right to sell it, and that he would defend its sale against all claims and demands. Haskins also gave the Sheldens an itemization of the tractor overhaul work he was to perform as part of the Agreement. At the bottom of the itemization Haskins included a second guarantee that there would be no liens or encumbrances against the tractor or its parts on the date set for its delivery, May 1, 1965.

After execution of the agreement Haskins took possession of the mining claims. He began working the claims and successfully extracted some gold from the claims before abandoning them. Unfortunately for Carrie Shelden, Haskins was not as diligent in making his payments on the Agreement as he was in mining the claim. The December 15, 1964, payment, which was to have been $1,500 to $2,500, was only $1,200. Haskins also failed to meet the three annual October payments. Despite the nonpayment, the Sheldens did not request Haskins to leave the claims. Nor at any time between November 4, 1964, and June, 1968, did the Sheldens hear anything from Haskins indicating dissatisfaction with the mining claims or with the transfer of the tractor.

On September 15, 1965, Haskins entered into a mining lease with Adolph and Roudolph Vetter, co-owners of the mining claims. The lease provided that the Vetters would "lease [to Haskins] their undivided ⅔ interest" in the mining property. The royalty that Haskins was to pay to the Vetters for his use of the property was based on ⅔ ownership of the property by the Vetters. Thus by the time the first annual installment was due in October, 1965, it had become apparent to Haskins that either the Vetters had overestimated their property ownership or Carrie Shelden

had. It was at this point that Haskins ceased making payments to Carrie Shelden.

On June 25, 1968, Haskins wrote to appellee's husband, John Shelden, informing him that there was a $2,500 lien on the tractor. Haskins announced that if the Sheldens were unwilling to satisfy the lien, Haskins would have to take back the tractor in order to sell it to pay off the lien.' John Shelden was also informed that Northern Commercial Company, the lienholder, had the registered Bill of Sale on the tractor. Regarding the mining claims, Haskins wrote:

I have vacated the mine property, it is still yours, you have passed no leanage [sic] to me. I am sorry things did not work out as we each hoped.

Prior to receipt of this letter, neither Carrie nor John Shelden had any notice of the Northern Commercial lien, even though Haskins admits that he knew of the lien when he guaranteed the tractor title against encumbrances.

In June, 1969, Northern Commercial obtained a judgment against Haskins for default on the tractor sales contract. The judgment was satisfied by execution on a debt owed to Haskins and his partner, appellant Donald Hancock. Since this execution on property jointly owned left Haskins in debt to Hancock, Haskins suggested that Northern Commercial issue the Bill of Sale for the tractor in Hancock's name.

The tractor was being stored on an unpatented claim occupied by appellee Fred Wackwitz and located along the side of the access road from Fairbanks Creek to the Steese Highway. The tractor had been left there by the Sheldens since 1966. The Sheldens had also left Wackwitz with their Bill of Sale from Haskins in case a discrepancy arose as to ownership of the tractor.

Shortly after receipt of the Bill of Sale from Northern Commercial, Haskins and Hancock flew out to where they thought the tractor was stored, but were unable to locate it. On a second trip Haskins spoke with appellee Wackwitz at his house about where the tractor was located. Wackwitz told Haskins that the only way Haskins could remove the tractor from Wackwitz's property was to return "with the law."

Haskins then approached Hancock and, claiming that he needed the tractor, offered to buy the tractor from Hancock if Hancock would retrieve it. After Hancock located the tractor, he presented his Bill of Sale to the State Troopers' office in Fairbanks, telling them to go get his tractor. No court or administrative proceedings were held at this point, nor did a court order accompany Hancock's request to the troopers.

On August 1, 1972, Wackwitz heard a car drive onto his property. He opened his door and observed a man, Donald Hancock, standing on top of the tractor. As Wackwitz approached the tractor, a police officer stopped him and showed him a Bill of Sale for the tractor.

Despite Mr. Wackwitz's protests, Hancock started the tractor. Mr. Wackwitz did not interfere because Hancock had "authority" with him. Hancock drove the tractor away. In doing so, Hancock knocked a coal bin cover weighing about a quarter of a ton from the adjoining property onto Wackwitz's road, blocking access to Wackwitz's house. Hancock also took a short cut which caused the collapse of a run-off ditch needed to maintain the access road to Wackwitz's home. Wackwitz's repair work on the ditch took several hours.

After Hancock recovered the tractor, he traded it to Haskins for a 1967 truck. No Bill of Sale evidenced the transaction.

On October 17, 1972, Carrie Shelden and Fred Wackwitz filed a complaint against George Haskins and Donald Hancock. Their complaint alleged (1) that the defendants breached the agreements made pursuant to and including the Purchase and Sale Agreement; (2) that the defendants willfully represented to the State Troopers that plaintiff-appellees were wrongfully in possession of the tractor; (3) that defendants unlawfully entered onto plaintiff's land to remove the tractor; (4) that defendants converted the tractor to their own use; and (5) that in the process

of removing the tractor from plaintiff Wackwitz's property, defendants acted "wilfully, wantonly, and maliciously, in utter disregard for the rights of either plaintiff, and damaged the buildings and structures" on Wackwitz's property. Plaintiffs sought compensatory damages and punitive damages. They also sought return of the tractor.

Defendants' answers disputed the plaintiffs' right to possession of the tractor because of plaintiff Shelden's inability to perform her duties under the Purchase and Sale Agreement. This claim turned on defendant Haskins' allegation that the Agreement contemplated delivery by Shelden of a ½ undivided interest in the mining claims. Defendants also filed a counterclaim against plaintiffs, but it was dismissed upon motion by plaintiffs.

A jury trial was had in April, 1975. Before the case went to the jury, the court declared that a valid contract existed between Shelden and Haskins but left it for the jury to determine if the contract was voidable by appellant Haskins. A verdict was returned in favor of plaintiffs Carrie A. Shelden and Fred Wackwitz. The trial court entered judgment according to the verdict, ordering that Carrie Shelden recover from George Haskins the Allis Chalmers tractor and $25,000 in punitive damages, plus attorney's fees of $1,000, costs and postjudgment interest and that Fred Wackwitz recover from Donald Hancock $500 in nominal damages, plus interest thereon.

From this judgment defendants George Haskins and Donald Hancock appeal. However, defendant Hancock did not properly perfect his appeal, so we do not reach any claims of error raised by him. Carrie Shelden cross appeals for recomputation of the award.

While appellant Haskins has raised 13 specifications of error, we deem only three of sufficient merit to require discussion herein.[1]

I. Did the trial court err in instructing the jury that there was a binding contract between George Haskins and Carrie Shelden?

A review of the record regarding the trial court's proposed instructions reveals that appellant made no objections to the instruction which informed the jury that there was a binding contract between the parties.[2] Nor did appellant propose any instruction which would have called this issue to the attention of the trial court.

---

1. We find the other specifications of error to be both without merit and waived by appellant for failure to brief the issues as required by Appellate Rule 11. See *Lewis v. State*, 469 P.2d 689, 691–92 n. 2 (Alaska 1970); *Parks v. Brown*, 368 P.2d 220 (Alaska 1962); *Veal v. Newlin, Inc.*, 367 P.2d 155, 157 (Alaska 1961); *Wernberg v. Matanuska Electric Ass'n*, 494 P.2d 790, 794 (Alaska 1972).

2. Appellant now attempts to take issue with Jury Instruction 14. That instruction provided:

The court has concluded that the transaction between George Haskins and Carrie Shelden amounted to a valid sales contract which was initially sufficient to transfer legal title to the aforementioned HD–20 Allis Chalmers tractor from George Haskins to Carrie Shelden. One of the questions before the jury is whether this contract could be voided by George Haskins.

To determine whether or not George Haskins had a right to void the contract you must determine what the contract said at the time it was entered into.

If you find that the change which was written into the contract in ink was a part of the contract at the time that the contract was signed by Haskins, then Carrie Shelden is entitled to the HD–20 Allis Chalmers tractor and, if appropriate under these instructions, to punitive damages.

If you find that the change written into the contract in ink was not in the contract at the time George Haskins signed said contract, then you must determine whether or not Carrie Shelden was able to, and did in fact transfer possession of a one-half interest in said mining claim to Haskins. If such a transfer was made, then Carrie Shelden is entitled to the HD–20 Allis Chalmers tractor and, if appropriate under these instructions, to punitive damages.

If you find that the change written into the contract in ink was not in the contract at the time George Haskins signed the contract and that Carrie Shelden was unable to transfer a one-half interest in the mining claims to Haskins, then George Haskins is entitled to the aforementioned Allis Chalmers tractor.

Civil Rule 51(a)[3] requires a party who wishes to assign error to a jury instruction to make an objection to the instruction at trial. A party who fails to so object is not entitled to review of an instruction unless it appears that giving the challenged instruction was plain error such that a miscarriage of justice would occur if the instruction was not reviewed.[4] A reading of the instruction given by the trial court herein does not suggest that a miscarriage of justice might have occurred.[5] In fact, a reading of the entire instruction reveals that the trial court adopted almost fully the position which appellant argues should have been taken.

In his brief appellant summarizes his objection to Jury Instruction 14 as follows:

> If the jury had not been instructed incorrectly that there existed a contract as a matter of law, it could have considered the testimony of Mr. Vetter regarding plaintiff Carrie Sheldon's [sic] prior knowledge of her one-third interest, determined that the contract was altered after signing, and found fraudulent conduct on the part of Carrie Sheldon [sic] in executing the contract, thereby voiding it entirely.[6]

Jury Instruction 14[7] did leave it to the jury to decide whether the Shelden interlineation appeared on the Purchase and Sale Agreement at the time appellant Haskins signed the Agreement. In addition, it provided that if the jury determined that the interlineation was not present when Haskins signed the Agreement, the jury would have to determine whether Carrie Shelden was able to transfer a one-half interest in the mining claims. This is exactly the position which appellant advanced in his brief.

II. Did the trial court err in allowing punitive damages where actual damages were not awarded to appellee?

Appellants contend that punitive damages cannot be awarded unless an award of actual damages is first made. This being so, they argue that appellee Sheldon cannot be allowed to recover punitive damages because she did not recover any actual compensatory damages. In response appellees argue that the judgment entitling appellee Shelden to recovery of the tractor is equivalent to the award of actual damages that is normally required.

On the subject of compensatory damages as a prerequisite to the award of punitive damages, McCormick notes that:

> it seems to be agreed without dissent that the allowance of exemplary damages does not widen the range of actionable wrongs. In other words, no state of facts exists upon which a claim for exemplary damages could be based, which would not be actionable if the claim for exemplary damages were omitted. . . . Consequently, the first inquiry must be, Does the complaint state a cause of action if the allegations relied upon solely to support the claim for exemplary damages be disregarded? If it does not, it is insufficient, and the claim for exemplary damages collapses with the rest of the case.[8]

The complaint herein stated a claim for relief in replevin which justified specific relief (i. e., return of the tractor) independent of punitive damages.

3. Civil Rule 51(a) provides in pertinent part: At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law set forth in the request. . . . No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. . . .

4. *Gregory v. Padilla*, 379 P.2d 951, 955 (Alaska 1963); *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 91–92 (Alaska 1974); *Meyst v. East Fifth Avenue Service, Inc.*, 401 P.2d 430, 434 (Alaska 1965). See also *Mitchell v. Knight*, 394 P.2d 892, 897 (Alaska 1964).

5. See 1 Corbin, Contracts § 6 at 12, n. 6 (West 1963).

6. Appellants' Brief at 12.

7. See note 2, *supra*.

8. McCormick, Damages § 83 (West 1953).

McCormick next notes that since most cases which the courts review involve causes of action in which injuries are not actionable without a showing of pecuniary harm, some courts have mistakenly broadened the principle that punitive damages can only be awarded incident to an independent cause of action to the "generalization that 'actual' damages must be awarded as a prerequisite to the allowance of exemplary damages."[9] McCormick points out that in most cases this mistaken view will not change the result. However, he does recommend recognition of a second principle which would cover situations such as the one presented herein:

> [I]t seems desirable to recognize the principle that, if a cause of action is found to exist by the jury, in a case where "actual" damage is not an essential element of the cause of action, then, if the necessary culpability on defendant's part be established, a verdict for exemplary damages is proper, though the award of other damages is nominal or absent entirely.

> It may well be . . . that in a given case the plaintiff has proved the *existence* of substantial pecuniary loss, but the evidence fails to fix the amount of that loss with sufficient definiteness to meet the law's standard of certainty. Does this establish a cause of action independent of punitive damages? As a matter of practical justice, it would seem to present a situation where, in cases of malice or recklessness, the requirement of certainty might well be relaxed as against a culpable wrongdoer by allowing a substantial recovery in the form of exemplary damages, and several decisions support the view that, *where the*

*fact of substantial damage is established, though not the amount, punitive damages may be given.*[10]

The instant case fits exactly within the second principle announced by McCormick. Appellee Sheldon originally sought to recover the value of the tractor from appellant Haskins on a conversion theory or a breach of warranty to defend title theory. The trial court determined that sufficient evidence had not been presented to warrant sending the case to the jury on either of these theories. Specifically the court ruled that there was not sufficient evidence presented as to the value of the tractor. However, the court did rule that the case could go to the jury for recovery of the tractor on a replevin or claim and delivery theory.

It is important to note that the trial judge specifically instructed the jury that it could not return a verdict against Haskins for punitive damages unless it was satisfied that actual damages had been shown. Jury Instruction 11 provided: "In order to recover exemplary damages, there must be actual damages *shown* [by appellee Shelden]." (Emphasis added) Thus the jury verdict represents an express finding that appellee Shelden had shown actual damages, even if she had not proven them with sufficient certainty to recover compensatory damages.

■ The second requirement to recovery of punitive damages is the existence of malice in the wrongdoer's actions.

> Punitive or exemplary damages are those awarded in excess of actual loss where the wrongdoer's conduct can be characterized as outrageous, such as acts done with malice or bad motives or a reckless indifference to the interests of another.[11]

9. *Id.*

10. *Id.* (citations omitted; first emphasis in original, second emphasis added). See *Sterling Drug v. Benatar*, 99 Cal.App.2d 393, 221 P.2d 965 (1950); *Village of Peck v. Denison*, 92 Idaho 747, 450 P.2d 310, 314–315 (1969); *Crystal Dome Oil & Gas Co. v. Savic*, 51 Idaho 409, 6 P.2d 155 (1932); *McClung-Logan Equipment Co. v. Thomas*, 226 Md.

136, 172 A.2d 494 (1961). *See also Winkler v. Hartford Accident & Indemnity Co.*, 66 N.J.Super. 22, 168 A.2d 418, 422 (App.Div. 1961), cert. denied 34 N.J. 581, 170 A.2d 544; *Barber v. Hohl*, 40 N.J.Super. 526, 123 A.2d 785, 789 (App.Div.1956).

11. *Bridges v. Alaska Housing Authority*, 375 P.2d 696, 702 (Alaska 1962).

Appellants argue that the record does not show the evil intent required to justify punitive damages. However, it should be noted that the award of punitive damages is "discretionary with the trier of fact."[12] The decision by the trier of fact to grant or deny punitive damages will be reversed only for clear abuse of discretion.[13]

Jury Instruction 11 in this case expressly required the jury to find "malice, fraud or gross neglect" as a prerequisite to awarding punitive damages. Therefore it must be assumed that the jury's verdict indicates a finding of the requisite malice.

We find that there was sufficient evidence before the jury from which it properly could conclude that appellant Haskins' conduct was malicious. Briefly stated, the record reveals that Haskins sold the tractor to appellee Shelden, guaranteeing its title against encumbrances at a time when he knew a lien existed against it. When the lienholder satisfied the lien with property owned jointly by Haskins and his partner, Haskins arranged for his partner to receive title to the tractor. Whether Haskins told his partner of the prior sale of the tractor to appellee Shelden is not at all clear. When Haskins decided he wanted the tractor back, he encouraged his partner to retrieve it, knowing that appellee Wackwitz, on whose land the tractor was stored, contested Haskins' right to remove the tractor.

Since there was a factual basis for the determination of malice, there was no abuse of the jury's discretion to award punitive damages. Therefore, the award is appropriate and should stand.[14]

III. Did the trial court err in denying appellant's motion for remittitur?

Appellant finally contends that the trial court erred by refusing to remit a portion of the $25,000 exemplary damage award. We have previously held that the decision whether to order a remittitur is within the discretion of the trial court. We only interfere in the exercise thereof in the most exceptional circumstances to prevent a miscarriage of justice.[15] We do not find such an abuse of discretion herein.

## CROSS APPEAL

Cross-appellant Shelden asserts error in two decisions of the trial court: (1) the failure to grant prejudgment interest on the award of $25,000 in exemplary damages, and (2) the award of only $1,000 in attorney's fees. We find the decision of the trial court to be correct on the issue of prejudgment interest and remand the issue of attorney's fees to the trial court for further proceedings.

Prejudgment interest is in the nature of compensation for use by defendant of money to which plaintiff is entitled from the time the cause of action accrues until the time of judgment. It is not meant to be an additional penalty.[16]

Prejudgment interest is not to be awarded where its award would do an injustice.[17] However, it is only in the most unusual cases that prejudgment inter-

12. *Id.*

13. *Schafer v. Schnabel*, 494 P.2d 802, 805 (Alaska 1972); *Nissen v. Hobbs*, 417 P.2d 250, 251 (Alaska 1966), citing *Bridges v. Alaska Housing Authority*, 375 P.2d 696 (Alaska 1962); Restatement, Torts § 908 (1939); Prosser, Torts § 2 at 9-11 (2d ed. 1955); McCormick, Damages § 84 at 296 (1935); 70 Harv.L.Rev. 517-533 (1957).

14. We are not presented in this case with an adversary attack on the concept of punitive damages. Appellant did not raise the issue of whether that concept retains any viable function in the present state of our common law. This issue is presented in a case currently before this court, *Day v. Sturm, Ruger and Co., Inc.*, Supreme Court Nos. 3092 and 3135.

15. *National Bank of Alaska v. McHugh*, 416 P.2d 239, 244 (Alaska 1966). *See also Hash v. Hogan*, 453 P.2d 468 (Alaska 1969).

16. *Davis v. Chism*, 513 P.2d 475, 481-82 (Alaska 1973).

17. *State v. Phillips*, 470 P.2d 266, 274 (Alaska 1970).

est is not proper.[18] One such unusual case is where the award of such interest would result in a double recovery.[19]

In this case award of prejudgment interest on the punitive damage award would result in such a double recovery. In making its determination of the appropriate penalty for Haskins' actions, the jury probably assessed the penalty it wished Haskins to presently pay without discounting for prejudgment interest. In addition, cross-appellant Shelden was not deprived of the use of money which she expected to have available during the years of litigation. Therefore, the trial court's decision to deny prejudgment interest in this case was a correct one.

Civil Rule 82(a)[20] provides a schedule of attorney's fees which are to be allowed to the prevailing party as costs of litigation. Rule 82(a)(1) directs that the schedule will be adhered to "in fixing such fees for the party recovering *any* money judgment," "[u]nless the court, in its discretion, otherwise directs . . . ." (Emphasis added)

Cross-appellant Shelden argues that the trial judge abused his discretion in awarding her only $1,000 in attorney's fees when the Rule 82(a)(1) schedule would entitle her to $3,350. Shelden also had requested $3,000 in fees in addition to the amount provided in the Rule 82 schedule, arguing that the amount of work necessary to bring this case to judgment warranted such an award.

This court has often noted that the award of attorney's fees to the prevailing party is committed to the broad discretion of the trial court. We will interfere with the trial court's exercise of that discretion only where it has been abused. Abuse of that discretion is established only by a "manifestly unreasonable" award.[21]

Although the trial court's discretion under Rule 82 is broad enough to warrant denial of attorney's fees altogether, denial of a proper motion for attorney's fees by the prevailing party may not result

---

18. *Davis v. Chism*, 513 P.2d 475, 481 (Alaska 1973).

19. *Era Helicopters, Inc. v. Digicon Alaska, Inc.*, 518 P.2d 1057, 1063 (Alaska 1974); *State v. Stanley*, 506 P.2d 1284, 1295 (Alaska 1973).

20. Civil Rule 82 provides in pertinent part:
(a) *Allowance to Prevailing Party as Costs.*
(1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein, as part of the costs of the action allowed by law:

ATTORNEY'S FEES IN AVERAGE CASES

|  | Contested | Without Trial | Non-Contested |
|---|---|---|---|
| First $2,000 | 25% | 20% | 15% |
| Next $3,000 | 20% | 15% | 12.5% |
| Next $5,000 | 15% | 12.5% | 10% |
| Over $10,000 | 10% | 7.5% | 5% |

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as part of the costs of the action, in its discretion, in a reasonable amount.
(2) In actions where the money judgment is not an accurate criteria for determining the fee to be allowed to the prevailing side, the court shall award a fee commensurate with the amount and value of legal services rendered.

21. *Palfy v. Rice*, 473 P.2d 606, 613 (Alaska 1970); *Froelicher v. Hadley*, 442 P.2d 51, 53 (Alaska 1968); *Cooper v. Carlson*, 511 P.2d 1305, 1309 (Alaska 1973); *Adoption of V.M.C.*, 528 P.2d 788, 795 (Alaska 1974).

from improper motive. Nor may the denial be arbitrary or capricious. [22] When the trial court departs from the Rule's schedule of fees, the reasons for the nonadherence should appear in the record. [23]

■ In view of the extended trial proceedings in this case, [24] there is clearly need for an explanation when the court departs from the Rule 82 schedule. The trial court award of $1,000 in attorney's fees is vacated, and this matter is remanded for further proceedings in the trial court.

AFFIRMED as to all matters except the award of attorney's fees and that issue remanded to the trial court for further proceedings.

BOOCHEVER, Chief Justice, concurring.

I base my concurrence on the portion of the opinion pertaining to the denial of appellants' motion for a remittitur on the failure of the appellant to comply with Appellate Rule 11(b)(1)[g] requiring in part that:

The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefore, with citations to the authorities, statutes and parts of the record relied on
. . . ..

Appellants' brief devoted one part of one sentence to the contention that it was error to deny the motion for remittitur. For this reason, I would not reach the merits of this contention. [1]

**22.** *Cooper v. Carlson,* 511 P.2d 1305, 1310–1311 (Alaska 1973).

**23.** *Patrick v. Sedwick,* 413 P.2d 169, 179 (Alaska 1966) ; *Cooper v. Carlson,* 511 P.2d 1305, 1310–1311 (Alaska 1973).

**24.** Proceedings below in this case included one default proceeding, two complete trials and numerous court appearances, as well as dismissal of cross-appellees' counterclaim.

1. *Wernberg v. Matanuska Electric Association,* 494 P.2d 790, 794 (Alaska 1972) ; *Lewis v. State,* 469 P.2d 689, 691, 692 n. 2 (Alaska 1970) ; *Associated Engineers & Contractors, Inc. v. H. & W. Const. Co.,* 438 P.2d 224, 228 (Alaska 1968).