Reggie I. CHAMBERS, Appellant,

v.

Dana SCOFIELD as guardian of Curtis N. Carley, Appellee.

No. S–13571.

Supreme Court of Alaska.

March 4, 2011.

Daniel W. Hickey and Anne M. Preston, Gruenstein & Hickey, Anchorage, for Appellant.

Bryon E. Collins, Bryon E. Collins & Associates, Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

*OPINION*

STOWERS, Justice.

## I. INTRODUCTION

A buyer bought a triplex from a seller. Two years later, the seller's daughter (who had been appointed to serve as his guardian) entered into a settlement agreement with the buyer to rescind the sale and compensate the buyer for the "fair market cost" of the improvements he had made to the property. In ruling on a motion to enforce the agreement, the superior court rejected the buyer's argument that the term "fair market cost" included compensation over and above the cost of labor and materials. The superior court also denied the buyer's motion to be named the prevailing party for purposes of Alaska Rules of Civil Procedure 79 and 82. Because the superior court's interpretation of the settlement agreement was not erroneous and the superior court did not abuse its discretion in declining to declare the buyer the prevailing party, we affirm.

## II. FACTS AND PROCEEDINGS

Reggie Chambers purchased a triplex from Curtis Carley in 2006. Dana Scofield and Noelle Covington, Carley's daughters, were appointed Carley's co-guardians by court order in July 2007 due to Carley's mental condition. Several months later Scofield sued Chambers, alleging in part that Chambers had fraudulently induced Carley to sell the triplex for far less than its market value.

On October 3, 2008, the parties entered into a settlement agreement. The agreement rescinded the sale and attempted to restore the parties to the positions they would have been in had the sale not occurred. The agreement provided that Chambers would quitclaim the triplex to Scofield and credit her with rents he received plus an additional $2,000. It also provided that Scofield would pay Chambers: (1) the $20,000 Chambers had already paid for the triplex, (2) a property management fee calculated as 10% of the actual rents collected, (3) for the utilities, taxes, and insurance actually paid, and (4) the "fair market costs" of repairs and improvements Chambers made to the interior and exterior of the triplex.

In order to determine the "fair market cost" of the repairs and improvements, the parties agreed to share the cost of a "neutral third party remodel appraiser." Scofield was to nominate the appraiser. If Chambers accepted Scofield's nominee, then that individual would perform the appraisal. If Chambers did not accept Scofield's nominee, then each party's nominations would be provided to the superior court and the court would decide.

On October 14, 2008, Scofield's attorney informed Chambers's counsel of Scofield's two nominations. Chambers accepted Keith Halsey, one of Scofield's nominations, because his services were less expensive than the other candidate's. Around the same time, Chambers's attorney also indicated to Scofield's attorney that he would be out of town for a month on his honeymoon and would prefer not to be disturbed with questions relating to the case. Scofield's attorney apparently asked Chambers's attorney if he would like to help instruct Halsey regarding the inspection, but Chambers's attorney declined, explaining that he was preparing to leave town and that the instructions in the settlement agreement were fairly straightforward. Scofield's attorney proceeded on her own to give Halsey instructions regarding the inspection. A week later Halsey inspected the triplex. Pursuant to the settlement agreement, which provided that each party had a right to attend the inspection, both Scofield and Chambers attended, along with representatives selected by each party.

Following the inspection Halsey called Scofield's attorney with several follow-up questions. Specifically, he wanted to know how to address various deficiencies he had discovered in the repairs Chambers had made. Scofield's attorney explained that because the parties had not expected these problems she could not offer specific guidance, but did ask him to take note of the deficiencies. Halsey prepared a two-page report. Halsey concluded that Chambers was entitled to a credit of $25,525 for the work performed on the triplex. Halsey acknowledged that the triplex had been substantially remodeled in recent years. But he observed that many repairs showed a "lack of craftsmanship" and that many of the renovations did not "demonstrate industry standards," which Halsey reflected in the estimates. He also asserted that the lack of municipal permits and inspections made any plumbing, electrical, and structural repairs obsolete. Halsey's report listed a number of specific deficiencies in the renovations, including a basement bedroom that illegally lacked an egress, a wheelchair ramp that lacked proper head-room, and a new roof that was not properly vented.

Halsey delivered the report to Scofield's attorney on November 7, 2008. Scofield submitted the report as an exhibit attached to her motion for enforcement of the settlement agreement on November 18, 2008. In response to Scofield's motion to enforce, Chambers moved for an extension of time, arguing that Halsey had neither written his report in good faith nor followed the settlement agreement's instructions. Superior Court Judge Morgan B. Christen held an evidentiary hearing to review Halsey's appraisal.

Halsey testified that prior to the inspection, Scofield's attorney had instructed him to:

> go into the property, review the property, review the repairs, see if they were done to workmanship standards, see if they were things done that Mr. Chambers said were done, to evaluate them, and ... write up a report on it.

He also testified that when he called Scofield's attorney to clarify what she meant by "evaluate," she explained that his report should chronicle deficiencies in the property, including elements that were not up to code and would require further repairs. Although the settlement agreement clearly stated that the appraiser was to estimate the "fair market costs" for the repairs and improvements that Chambers made, Halsey admits that his final estimate took both cost and value into account.

Apparently as a result of the calculation approach Halsey used, which took both cost and value into account, Halsey decided not to give Chambers any credit for a number of repairs that were not up to code: electrical repairs, the new roof over the east side of the triplex, improvements to the basement bedroom, and repairs to the basement stairs. Halsey gave Chambers only partial credit for a wheelchair ramp, which Halsey felt did not have sufficient head-room. It is not clear, however, that the error in Halsey's methodology resulted directly from faulty instructions by Scofield's attorney. Halsey did not testify that Scofield's attorney asked him to use a "fair market value" methodology rather than the "fair market cost" methodology the

settlement specified.[1] Halsey testified that the attorney did ask Halsey to take deficiencies into account, but as Halsey explained, this observation could go to the amount of time Chambers had put into the projects—a factor relevant to the cost determination.

Halsey also expressed his belief that Chambers had not actually made all of the repairs and improvements he claimed. Halsey explained that he "gave [Chambers] the benefit of the doubt, but there were numerous instances in which [he] simply did not believe what [Chambers] was telling [him] because of what [he] could see with [his] own eyes." Specifically, Halsey testified that Chambers claimed certain doors were new, which in Halsey's eyes were "clearly not new." Halsey also testified that some of the receipts Chambers offered did not match the items Chambers alleged they were for. Halsey stated in his affidavit that Chambers's workman, whom Chambers had brought to the inspection, openly disagreed with Chambers's characterization of what repairs had been made. He described an instance in which Chambers claimed walls had been taken down and replaced, but the workman corrected him and said that only the sheetrock had been repaired and re-textured. Halsey never implied that his skepticism about Chambers's claims was inspired by anything other than what occurred during the inspection.

Halsey testified that Scofield's attorney had told him that his determinations whether Chambers had actually made a given repair or improvement should be "backed up with receipts." Halsey testified that Chambers's inability to produce receipts for the dishwasher and refrigerator he claimed to have installed in one of the units led Halsey to conclude that it was unnecessary to make note of the appliances in the other units. Halsey explained that a lack of receipts and invoices was another reason he had not given Chambers full credit for the wheelchair ramp.

After Halsey testified at some length, Chambers's attorney moved to strike Halsey's report. He argued that the settlement agreement called for a neutral appraiser, and "it's unequivocally the case that [Halsey] wasn't neutral" and that Halsey's testimony showed that he had a "predisposition to disbelieve" Chambers. The superior court responded that it did not agree that Halsey's testimony had shown that he was not neutral, but that it would consider the possibility that Halsey's methodology was flawed. Scofield's attorney urged the court to accept Halsey's report, acknowledging that no appraisal is perfect but defending Halsey's work on the grounds that he had the additional and unanticipated job of assessing Chambers's credibility as well as the "challenging task" of appraising so-called improvements that were so deficient that they would require substantially more work to render them serviceable. After hearing argument from both sides, the court concluded that there were "unremediable infirmities" in Halsey's methodology because he was not given "enough direction about what his job was." The court determined that a new inspection and appraisal would be necessary.

Following the hearing, both parties met off the record with the court to draft a "set of rules" for the new inspection, and the parties agreed that Judge Christen would attend the next inspection. Following the off-record meeting, the court appointed William Roberts as the new appraiser. Roberts conducted an inspection of the triplex on February 16, 2009. After his inspection, Roberts issued a 47–page report and estimated that without including the profit and overhead that would normally be included, the total "fair market cost" of repairs and improvements made to the triplex was $86,692.29, less $14,016.99 for work that he considered done to less-than-workmanlike standards.

The court held a second evidentiary hearing where both Roberts and Chambers's expert, Robert Lutje, testified. Both testified that the "fair market costs" of the remodeling project should include an additional factor over and above labor and materials as an allowance for profit and overhead, including

---

1. Halsey stated that Scofield's attorney told him to assess the repairs' "value as to time and materials."

the time necessary for managing, overseeing, and staging the project. They testified that general contractors charge 20%, but that an unlicensed owner should be entitled to something less. Chambers testified that he acted much like a general contractor in overseeing the project.

The court rejected Chambers's claim for profit and overhead, finding that the settlement agreement did not "require payment of profit and overhead or any other fee for supervising the work done on the triplex." The court also adopted many of Roberts's conclusions as to which costs should be disallowed or reduced due to a lack of workmanship, finding that the total "fair market cost" of the improvements was $86,872.29 minus $5,693.73. The court also agreed with Roberts's assessment that at least one of the doors Chambers claimed to have installed had actually been installed before Chambers took possession of the property.

After the court entered its findings of fact and conclusions of law, Chambers filed an objection to payment of Halsey's fees. The court rejected Chambers's argument, stating:

> The parties mutually selected Mr. Halsey. Mr. Halsey was not given proper instructions and his work had to be repeated, but both parties share responsibility for the failure to instruct Mr. Halsey adequately and/or to otherwise agree upon ground rules for his work, including his interaction with the parties and their counsel.
>
> Mr. Halsey doubted Mr. Chambers' credibility; that does not equate to Mr. Halsey being unfairly biased against Mr. Chambers. Rather, Mr. Halsey testified regarding what he perceived to be inconsistencies in Mr. Chambers' explanations and descriptions of the work done on the subject premises.

Chambers also moved to designate him the prevailing party for purposes of Civil Rules 79 and 82. The court denied his motion, stating:

> The bulk of the Court's adjustments to the reimbursement total reflected in Mr. Roberts' report consisted of instances in which the Court allowed some of the claimed credits by Mr. Chambers (because the repairs improved the rental property) but

less than the requested amount because the repairs were not performed to workmanlike standards. Considering this, and considering the other orders entered post-settlement [rejecting Chambers's arguments regarding expert fees and security deposits], the Court finds that neither party is fairly deemed the prevailing party in this case. Both shall bear their own fees and costs.

Chambers moved for reconsideration of the order denying him prevailing party status, arguing that Scofield bore responsibility for the errors in Halsey's report, that Chambers rightly objected to the report's conclusions, and consequently that the court's decision not to rely on the Halsey report necessitated a finding that Chambers was the prevailing party on the main issue of the case. The court denied the motion, finding that Chambers bore some of the responsibility for Halsey's flawed methodology because he did not choose to exercise his right to "have input in the direction given to Mr. Halsey." The court also noted that Chambers was present for the inspection, and if he objected to the way Halsey had conducted the inspection, he could have made these objections known informally via counsel or formally to the court. His failure to do so rendered him partially responsible for the irreparable flaws in Halsey's report. The court also rejected Chambers's assertion that Halsey was biased against him, finding that Halsey adequately explained his reasons for doubting some of Chambers's claims.

The court entered its final judgment.

Chambers raises two points on appeal. First, he argues that the court erred in ruling that the settlement agreement did not require that Chambers receive credit for profit and overhead. Second, he argues that the court abused its discretion in deciding that he was not the prevailing party for purposes of Rules 79 and 82.

### III. STANDARD OF REVIEW

We review a trial court's findings of

fact for clear error.[2] We apply our independent judgment to questions of contract interpretation.[3]

■■ We review a trial court's prevailing party determinations for abuse of discretion, which exists if the determination was arbitrary, capricious, manifestly unreasonable, or improperly motivated.[4] A trial court's discretion under Rule 82 is broad enough to warrant denial of attorney's fees altogether, so long as the trial court's reasons for departing from the Rule's schedule of fees appear in the record.[5] We have held that a trial court does not abuse its discretion in refusing to award either party fees where neither party is characterized as the prevailing party.[6]

## IV. DISCUSSION

### A. The Settlement Agreement Did Not Entitle Chambers To Credit For Profit And Overhead.

Chambers argues that the settlement agreement entitles him to a credit for the time he spent supervising the repairs and remodel, and that this time falls into the category of "profit and overhead" typically charged by general contractors. He argues that compensation for this time is included in the "plain and fair meaning" of "fair market cost," and that both Roberts's and Lutje's testimony support his position.

■■ The central question is whether the "fair market costs" of the repairs and improvements that Chambers is entitled to under the settlement agreement include compensation for profit and overhead. A settlement agreement forms a binding contract when the agreement satisfies the four elements of contract formation: an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound.[7] Because the parties' settlement agreement satisfies these requirements, it is a binding contract, and we interpret it according to the rules of contract interpretation.[8] We apply our independent judgment to questions of contract interpretation.[9] Our goal in interpreting contracts is to enforce the reasonable expectations of the parties.[10] We analyze the parties' expectations by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties.[11] We have held that the terms of a contract are to be interpreted according to "the general and accepted usage of the trade or business involved."[12]

We have never before interpreted the phrase "fair market cost"[13] and neither party introduced extensive evidence on this

---

**2.** *Hooper v. Hooper,* 188 P.3d 681, 685 (Alaska 2008).

**3.** *Rockstad v. Erikson,* 113 P.3d 1215, 1219 (Alaska 2005).

**4.** *Fernandes v. Portwine,* 56 P.3d 1, 4–5, 7–8 (Alaska 2002) (affirming trial court's decision that neither litigant was the prevailing party for Rule 82 purposes).

**5.** *Id.* at 8 (quoting *Haskins v. Shelden,* 558 P.2d 487, 495–96 (Alaska 1976)).

**6.** *Id.* (quoting *City of Valdez v. Valdez Dev. Co.,* 523 P.2d 177, 184 (Alaska 1974)).

**7.** *Kazan v. Dough Boys, Inc.,* 201 P.3d 508, 513 (Alaska 2009) (quoting *Wyatt v. Wyatt,* 65 P.3d 825, 828 (Alaska 2003)).

**8.** *See Gaston v. Gaston,* 954 P.2d 572, 574 (Alaska 1998) ("Settlement agreements should be interpreted as contracts provided that they meet minimal contractual requirements.") (citing *Davis v. Dykman,* 938 P.2d 1002, 1006 (Alaska 1997)).

**9.** *Rockstad v. Erikson,* 113 P.3d 1215, 1219 (Alaska 2005).

**10.** *Smith v. Cleary,* 24 P.3d 1245, 1249 (Alaska 2001) (quoting *Municipality of Anchorage v. Gentile,* 922 P.2d 248, 255–56 (Alaska 1996)).

**11.** *Id.*

**12.** *Dominic Wenzell, D.M.D. P.C. v. Ingrim, D.M.D.,* 228 P.3d 103, 108 (Alaska 2010) (quoting *Stock & Grove, Inc. v. City of Juneau,* 403 P.2d 171, 176 (Alaska 1965) (holding that contractual term "practice of dentistry" should be interpreted according to common industry definition)).

**13.** Black's Law Dictionary defines "fair market value," but it does not define "fair market cost" or "market cost." BLACK'S LAW DICTIONARY 634 (8th ed.1999).

point. Roberts and Lutje agreed that contractors typically charge an additional percentage over and above the cost of labor and materials as compensation for time spent managing, organizing, and supervising a project.[14] Both testified that a contractor would typically receive an additional 20% for this profit and overhead. Lutje testified that even though Chambers was not a professional, and therefore not entitled to the full 20%, Chambers did spend a good deal of time supervising the project and deserved to be compensated. He recommended that Chambers receive an additional 10% credit for profit and overhead; however, he went on to state that this 10% figure was based on Chambers's proposal, and he did not testify that it represented any sort of industry standard.

Roberts's testimony on the matter is not entirely clear. He stated that where a property owner did the work himself, "overhead and profit probably would not be necessary or available." But looking at his words in context, he appeared to mean that where a property owner does the work himself for his own benefit, he would neither receive compensation for profit and overhead (because no one was paying him to do the work) nor pay anyone profit and overhead (because he was not paying anyone else to do the work). Roberts did not appear to be speaking to the peculiar situation here, where a property owner did the work himself expecting it to be for his own benefit, but later contracted to transfer the property and expected to be retroactively compensated for the repairs and improvements he made. Roberts specifically declined to offer an opinion as to what would be appropriate compensation for time spent supervising the project in this context. On the whole, Roberts's testimony suggests that, given these unique circumstances, there is no industry standard defining "fair market cost" in this context.

■ In the absence of an industry standard clearly indicating that "fair market cost" includes an additional credit for profit and overhead in cases like this one, we hold that Chambers is not entitled to additional compensation under the settlement agreement. As the superior court emphasized, the settlement conference was conducted *after* Chambers had completed work on the triplex. Therefore, by the time the parties negotiated and agreed upon the terms of their settlement agreement, Chambers had full knowledge of all that had gone into making the repairs and improvements—labor, materials, and time spent overseeing the project. Yet Chambers did not make the issue of profit and overhead explicit in the settlement agreement, and there is no evidence in the record that he asked to be compensated for profit and overhead. Instead, he agreed to be compensated for "fair market costs"—a term that, as discussed above, is ambiguous in this context—and consented to a settlement agreement that made no provision for profit, overhead, time spent overseeing the project, or an additional percentage over and above labor and materials to represent Chambers's work supervising the project. If Chambers had contemplated a credit for profit and overhead, he should have made the agreement explicit to that effect.[15]

## B. The Superior Court Did Not Abuse Its Discretion In Declining To Designate Chambers The Prevailing Party For Purposes Of Rules 79 and 82.

Alaska Rules of Civil Procedure 79 and 82 allow for the award of costs and fees, respectively, to the prevailing party in a civil case.[16]

14. *See also State ex rel. Allstate Ins. Co. v. Gaughan,* 220 W.Va. 113, 640 S.E.2d 176, 180 n. 2 (2006) (stating that "fair market cost" includes compensation for a contractor's profit and overhead).

15. We also note Roberts's testimony that where a property owner does the work himself, as Chambers did here, time spent "lining up the materials is part of the labor involved." This implies that Roberts may have included the time Chambers spent supervising the project when he calculated the total cost of Chambers's labor—a cost that is included in the "fair market cost" estimate here. Whether Roberts did or did not include some supervisory work cost as an element in his calculation of labor costs is not material to our holding that the settlement agreement did not entitle Chambers to compensation for profit and overhead.

16. Alaska R. Civ. P. 79(a); Alaska R. Civ. P. 82(a).

The superior court noted that the final amount credited to Chambers for repairs and improvements made to the triplex was less than the amount Chambers requested. It also found that Chambers was partially responsible for the flaws in Halsey's report, and rejected Chambers's assertion that Scofield had biased Halsey against him.

■ Chambers argues that the superior court erred in declining to designate him the prevailing party. Echoing his arguments in the superior court, Chambers points to a number of facts that he asserts collectively compel the conclusion that he was the prevailing party.

As we previously explained, we review a trial court's prevailing party determinations for abuse of discretion, which exists if an award is arbitrary, capricious, manifestly unreasonable, or improperly motivated.[17] A trial court's discretion under Rule 82 is broad enough to warrant denial of attorney's fees altogether, so long as the trial court's reasons for departing from the Rule's schedule of fees are clear in the record.[18] We have held that a trial court does not abuse its discretion in refusing to award fees where neither party can be characterized as the prevailing party.[19]

In this case, the superior court's conclusion that Chambers was not the prevailing party is supported by the record. Taking the litigation as a whole, including the parties' written pleadings and both evidentiary hearings, it was not an abuse of discretion for the superior court to deny Chambers's motion to be named the prevailing party for purposes of Rules 79 and 82.

At the first evidentiary hearing Scofield urged the court to rely on Halsey's report despite its faults, while Chambers argued the report was irreparably flawed. Because the superior court agreed with Chambers, concluding that there were "unremediable infirmities" in Halsey's methodology, and ordering a new report on that basis, Chambers prevailed on that discrete issue. But the superior court also found that Chambers was partially at fault for not participating in giving Halsey proper direction. This finding cuts against Chambers's argument that he was a prevailing party overall.

At the second evidentiary hearing, each party prevailed to some extent. Chambers argues that he was the prevailing party because the superior court rejected Scofield's challenges to Roberts's appraisal. Although the court did reject most of Scofield's challenges, it also rejected a number of Chambers's challenges to the same report. First, Chambers argued that the "fair market" cost should include a percentage for profit and overhead. The superior court disagreed with Chambers, holding that the contract did not require payment of a percentage for profit and overhead—a holding that we affirm in this opinion. Second, Chambers had his own expert, Robert Lutje, testify at the second evidentiary hearing as to the "fair market cost" of the repairs and improvements. Lutje testified that Chambers should be credited approximately $115,000 for the repairs and improvements he made to the triplex. Although the superior court found Lutje's testimony helpful, it adopted a final value much closer to Roberts's estimate, crediting Chambers some $35,000 less than Lutje proposed.[20] The superior court gave clear reasons for its decision not to declare Chambers the prevailing party. On balance, we cannot say that the superior court abused its discretion in reaching this conclusion.

Chambers also makes several factual assertions on appeal that are inconsistent with the superior court's findings, implying that the superior court's decision not to name him

17. *Fernandes v. Portwine*, 56 P.3d 1, 4–5, 7–8 (Alaska 2002) (affirming trial court's decision that neither litigant was the prevailing party for Rule 82 purposes).

18. *Id.* at 8 (quoting *Haskins v. Shelden*, 558 P.2d 487, 495–96 (Alaska 1976)).

19. *Id.* (quoting *City of Valdez v. Valdez Dev. Co.*, 523 P.2d 177, 184 (Alaska 1974)).

20. Chambers also argues that he was the prevailing party because the final value the court chose was closer to Lutje's estimate than Halsey's. By comparing the appraisals in this way, Chambers implies that Halsey was Scofield's expert. Because Halsey was not Scofield's expert, but rather was jointly selected by *both* parties, this argument is unpersuasive.

the prevailing party was based on erroneous factual premises. Because Chambers's factual assertions do not find support in the record, we conclude that the superior court's factual findings were not clearly erroneous.

First, Chambers contends that Scofield's attorney directed Halsey to use "fair market value" methodology rather than "fair market cost methodology." The record does not support this contention. Halsey testified that Scofield's attorney told him to assess the repairs' "value as to time and materials." But while Scofield's attorney may have used the word "value," the concept she communicated was market cost: she asked Halsey to estimate the price of time and materials, as opposed to what the repairs added to the value of the triplex. At most, this evidence shows an imprecise use of language on the part of Scofield's attorney—not that Scofield instructed Halsey to use "fair market value" methodology, as Chambers claims.

Second, Chambers asserts that Scofield biased Halsey against him, but the record does not bear this out. It is true that Halsey questioned whether Chambers had actually made some of the repairs he claimed. But this does not show that Halsey was biased against Chambers; Halsey clearly explained his reasons for doubting some of Chambers's claims when he testified that "there were numerous instances in which [he] simply did not believe what [Chambers] was telling [him] because of what [he] could see with [his] own eyes." Halsey testified that some of the receipts Chambers offered did not match the items Chambers alleged they were for, and he stated in an affidavit that even Chambers's workman openly disagreed with Chambers's characterization of what repairs had been made.

Although it is true that Roberts did not share the same degree of skepticism towards Chambers's claims, this fact does not prove that Halsey was biased. This and the other differences between the two expert reports merely illustrate the fact that individual appraisers will often come to different conclusions about a property they appraise; it is for this reason that litigants often seek multiple opinions when trying to value property. Also, Roberts was not wholly credulous in evaluating Chambers's claims; he concluded that at least one of the doors Chambers claimed to have installed had actually been installed some time before Chambers took possession of the property, and the superior court adopted this conclusion, suggesting that at least some of Halsey's doubts were well-founded. For these reasons, we hold that the superior court did not clearly err in declining to draw the inference that Scofield biased Halsey against Chambers.

## V. CONCLUSION

Because there is no industry standard clearly indicating that "fair market cost" includes additional profit and overhead in the context of this case, and because Chambers failed to specifically contract for additional compensation over and above the cost of labor and materials, we AFFIRM the superior court's decision not to award Chambers any profit and overhead.

Because the record supports the superior court's findings that neither party was the prevailing party, we AFFIRM the superior court's denial of Chambers's motion to be named the prevailing party for purposes of Rules 79 and 82.

CHRISTEN, Justice, not participating.