*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SITKA TRIBE OF ALASKA, | ) | |
| | ) | Supreme Court No. S-18114 |
| Appellant, | ) | |
| | ) | Superior Court No. 1SI-18-00212 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, ALASKA | ) | |
| DEPARTMENT OF FISH & GAME, | ) | No. 7679 – December 29, 2023 |
| and SOUTHEAST HERRING | ) | |
| CONSERVATION ALLIANCE, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Sitka, Daniel Schally, Judge.

Appearances: John M. Sky Starkey, Jennifer Coughlin and Andrew Erickson, Landye Bennett Blumstein LLP, Anchorage, for Appellant. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee State of Alaska. Michael A. D. Stanley, Juneau, for Appellee Southeast Herring Conservation Alliance. Jon K. Tillinghast, Simpson Tillinghast Sheehan, P.C., Juneau, for Amicus Curiae Sealaska Corporation.

Before: Winfree, Chief Justice, Carney and Henderson, Justices, Fabe and Bolger, Senior Justices.*

---

\* Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

[Maassen and Borghesan, Justices, not participating.]

CARNEY, Justice.
WINFREE, Chief Justice, concurring in part.

# I.    INTRODUCTION

A tribe claimed that the State's management of a commercial fishery harmed a subsistence fishery. The tribe alleged that the State violated the subsistence priority statute and the common use and sustained yield clauses in article VIII, sections 3 and 4 of the Alaska Constitution. It also alleged that the State was misinterpreting the regulation that controlled the fishery and sought a preliminary injunction to prevent the State from managing the fishery according to that interpretation during the upcoming season. The superior court denied the preliminary injunction.

The tribe ultimately prevailed on its statutory and regulatory claim, but the superior court denied its constitutional claim and its request for attorney's fees. The tribe appeals, arguing that article VIII, section 4 of the Alaska Constitution requires the Alaska Department of Fish and Game (the Department) to provide all relevant information to the Board of Fisheries (the Board); that the tribe did face irreparable harm warranting a preliminary injunction; and that the tribe was the prevailing party for purposes of awarding attorney's fees. We affirm the superior court's decisions.

# II.    FACTS AND PROCEEDINGS

## A.    Facts

The Sitka Tribe of Alaska (the Tribe) is a federally recognized Alaska Native tribe located in southeast Alaska.[1] Alaska Natives throughout southeast Alaska have traditionally relied on harvesting herring eggs for subsistence and cultural

---

[1]    Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 79 Fed. Reg. 4748–4753, 4752 (Jan. 29, 2014); *About Us,* SITKA TRIBE ALASKA, https://www.sitkatribe.org/pages/about-us-about-us.

purposes.[2]  Herring in Sitka Sound is harvested for both subsistence[3] and commercial uses.[4]  The different harvesting methods for commercial and subsistence uses pose a fundamental regulatory challenge.  The commercial sac roe herring fishery uses purse seine gear to capture pre-spawn herring.[5]  The subsistence fishery collects herring eggs later deposited on hemlock branches and other plants.[6]

Alaska's Constitution grants extensive powers to the legislature to manage natural resources.[7]  The legislature established the Department and granted its commissioner the authority to "manage, protect, maintain, improve, and extend the fish, game and aquatic plant resources of the state in the interest of the economy and general

---

[2]  THOMAS F. THORNTON ET AL., HERRING SYNTHESIS 17, 49 (2010) (synthesizing historical and cultural ecological knowledge of southeast Alaska herring).

[3]  "Subsistence uses" are "noncommercial, customary and traditional uses of wild, renewable resources by a resident domiciled in a rural area of the state for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources . . . and for the customary trade, barter, or sharing for personal or family consumption."  AS 16.05.940(34).

[4]  5 Alaska Administrative Code (AAC) 27.110(b) (2023); 5 AAC 27.195.

[5]  *See* 5 AAC 27.195; *see also* 5 AAC 27.110; 5 AAC 27.160(g); AARON DUPUIS ET AL., 2022 SOUTHEAST ALASKA HERRING SAC ROE FISHERY MANAGEMENT PLAN 1-3 (2022), https://www.adfg.alaska.gov/FedAidPDFs/RIR.1J.2022.05.pdf.

[6]  *See* LAUREN A. SILL AND MARGARET CUNNINGHAM, THE SUBSISTENCE HARVEST OF PACIFIC HERRING SPAWN IN SITKA SOUND, ALASKA, 2021 23 (2021), https://www.arlis.org/docs/vol1/ADFG/TP/4/TP486.pdf.

[7]  Alaska Const. art. VIII § 2.

well-being of the state."[8]  And the legislature created the Board of Fisheries "for purposes of the conservation and development of the fishery resources of the state."[9]

In fisheries matters the Board acts as "a policy-making agency" and the Department acts as "a policy-implementing agency."[10]  The Department relies on the Board's policy decisions to make in-season decisions about when and where to open the commercial fishery consistent with the regulations.[11]  One regulation, 5 AAC 27.195, requires the Department to "distribute the commercial harvest by fishing time and area if the department determines that it is necessary to ensure that subsistence users have a reasonable opportunity to harvest the amount of herring spawn necessary for subsistence uses."[12]  The Department has never interpreted 5 AAC 27.195 to require an assessment of the quality and quantity of herring spawn on branches in-season. Although the Board has "regulatory-making powers," it does not have independent authority to commission studies or collect scientific information.[13]  The subsistence fishery is largely unregulated; except for herring spawn on kelp, no permit is required or limits imposed on taking herring eggs for subsistence uses in southeast Alaska.[14]

---

**8**    AS 16.05.020(1)-(2); *see also* 5 AAC 27.059 ("[T]he department may manage commercial herring sac roe fisheries.").

**9**    AS 16.05.221(a); *see also Grunert v. State*, 109 P.3d 924, 937 (Alaska 2005).

**10**    *Johnson v. Alaska State Dep't of Fish & Game*, 836 P.2d 896, 901 (Alaska 1991) (discussing management of salmon fisheries).

**11**    *See, e.g.*, 5 AAC 27.059; 5 AAC 27.190; 5 AAC 27.195.  *Cf.* 5 AAC 27.463.

**12**    5 AAC 27.195(a)(2).

**13**    *See* AS 16.05.241 (granting the Board "regulation-making powers" but excluding "administrative, budgeting, or fiscal powers"); *see also* AS 16.05.050 (granting Department commissioner authority "to collect, classify, and disseminate statistics, data and information").

**14**    5 AAC 01.710(c); 5 AAC 01.730(a); 5 AAC 01.745.

Commercial fisheries in southeast Alaska are managed under a "threshold" management approach.[15] The commercial fishing season opens if the annual expected herring biomass (total weight of herring) exceeds the "threshold," which is "the herring biomass needed to meet [the] minimum spawning and/or allocation requirements."[16] The current threshold is 25,000 tons.[17] If this threshold is met, the commercial fishery may open subject to the guideline harvest level.[18] The guideline harvest level is a percentage of the spawning biomass, ranging from 12% to 20% and increasing with the size of the biomass.[19]

In 2001 the Tribe raised concerns that subsistence harvesters' needs were being subordinated to commercial demands for marketable roe. Between 2001 and 2009 the Department and the Tribe attempted to collaborate to address this concern. Finally, in 2012 the Board closed a portion of Sitka Sound to commercial fishing; the Board expanded the closed area in 2018.[20] Despite the expanded commercial closure, herring spawn in the traditional area was lower than expected and the subsistence harvest was a record low in 2018. The Department's scientists attributed the changed spawning pattern to a number of potential factors, including natural variability,

---

[15] DUPUIS ET AL., *supra* note 5, at 3.

[16] *Id.*

[17] 5 AAC 27.160(g) ("The fishery will not be conducted if the spawning biomass is less than 25,000 tons.").

[18] *Id.* " '[G]uideline harvest level' means the preseason estimated level of allowable fish harvest which will not jeopardize the sustained yield of the fish stocks." 5 AAC 39.975(a)(27).

[19] 5 AAC 27.160(g). The Department forecasts the mature biomass, and calculates and sets the guideline harvest level each year. DUPUIS ET AL., *supra* note 5, at 3, 8.

[20] *Compare* 5 AAC 27.150(7) (2012) *with* 5 AAC 27.150(7) (2018).

predators, water temperature, and plankton distribution, but they did not identify the commercial fishery as a primary cause.

After the poor harvest the Tribe and other subsistence users requested an agenda change for the upcoming Board meeting in October 2018.[21] The agenda change proposed closing the commercial fishery until (1) herring stocks showed "signs of rebound,"[22] (2) there was a better understanding of "herring genetic structure, seasonal movements, and [the] potential impacts of disturbing herring spawning areas," and (3) "the amount necessary for subsistence [was] achieved for three consecutive years." The Department responded that the herring biomass did not appear to have changed appreciably since the Board last considered the fisheries and the subsistence fishery likely did not harvest the "amount necessary for subsistence" in 2018 because "the location of spawning shifted away from typical areas near the city of Sitka to across Sitka Sound on shores of Kruzof and Krestof islands." The Department advised the Board that the Tribe had not met the criteria for considering an agenda change: a conservation concern or compelling new information about the allocation of the resource among users.[23] The Board, with one member dissenting, voted to not consider the request.

In November representatives of the Tribe and the Department discussed how to improve herring management. The Tribe submitted a proposed subsistence management plan to provide guidance to the Department's in-season manager to delay the start of the commercial fishery. The Department responded by indicating that

---

[21] The Board "will, in its discretion, change its schedule for consideration of a proposed regulatory change in response to an agenda change request." 5 AAC 39.999(a).

[22] The Tribe cited traditional knowledge "that older, larger herring lead the younger fish to productive spawning locations, and thus, older herring are vital to successful spawns and the continued health and sustainability of the herring stock."

[23] *See* 5 AAC 39.999 (providing criteria for granting agenda change request).

although it was "committed to engagement in collaboration," it could not "commit to delaying [the] start of the commercial fishery until after spawning has begun."

## B. Proceedings

In December 2018 the Tribe filed a complaint for declaratory and injunctive relief against the State, the Board, and the Department. Relevant to this appeal the complaint alleged violations of the subsistence priority statute[24] and the common use and sustained yield clauses in the Alaska Constitution.[25] The Southeast Herring Conservation Alliance sought to intervene to "defend the interests of fishermen, processors and others who participate in and depend on the commercial herring sac roe fishery in Sitka Sound."

In January 2019 the Tribe moved for a preliminary injunction to prevent the Department from managing the Sitka Sound herring fishery under its allegedly flawed interpretation of 5 AAC 27.195 during the coming season. The Tribe claimed that 5 AAC 27.195 requires the Department to determine "whether it is necessary to manage the commercial fishery through distribution of commercial harvest by time and area in order to ensure that subsistence users have a reasonable opportunity to harvest the amount of herring spawn necessary for subsistence uses," and that this determination must be based on the Department's assessment of the quality and quantity of spawn on branches that is available for subsistence harvest. The Department and the Alliance argued that the Tribe failed to satisfy either of the standards that authorize a preliminary injunction because it neither faced irreparable harm or was likely to succeed

---

[24]    *See* AS 16.05.258. The Tribe alleged that the Department "failed to manage the Sitka Sound commercial and subsistence herring fisheries consistent with mandatory obligations under 5 [AAC] 27.195." Count I was pled in the alternative: if the court concluded that the Department was not violating its duties under 5 AAC 27.195, then the Tribe claimed that the Department and the Board violated their statutory duties to provide a priority for subsistence uses as required by AS 16.05.258.

[25]    Alaska Const. art. VIII, §§ 3-4.

on the merits. The Alliance also argued that its members would be harmed if an injunction were granted.

The superior court denied the Tribe's motion in February, finding that the Tribe had not demonstrated that it faced irreparable harm and that "[n]either test for entry of a preliminary injunction" had been satisfied.[26]

In November the parties filed cross-motions for summary judgment on the Tribe's claim that the Department did not lawfully interpret and implement 5 AAC 27.195. On March 31, 2020, the superior court granted the Tribe's motion for partial summary judgment with respect to 5 AAC 27.195(a) and denied the Department's and the Alliance's cross-motions. The court concluded that "[t]o the extent that ADFG interprets subsection (a) as requiring the subordination of its duty to distribute the commercial harvest by time and area to opening the commercial harvest in any way, the interpretation is unreasonable and inconsistent with the plain language and context of the regulation." The Tribe subsequently dismissed its claims against the Board.

In November 2020 the superior court granted the Tribe's renewed motion for partial summary judgment on its 5 AAC 27.195(b) claim. The court found there was "no genuine dispute of material fact as to whether" the Department was "unlawfully implementing 5 AAC 27.195(b) by failing to consider quality of herring spawn 'on branches, kelp, and seaweed, and herring sac roe' before making required management decisions under 5 AAC 27.195(a)(2)."

In March 2021 the superior court issued a third summary judgment order, denying the Tribe's claim that the Department has a constitutional duty to provide the

---

[26]     We denied the Tribe's interlocutory petition for review. *Sitka Tribe of Alaska v. State, Dep't of Fish & Game*, No. S-17384 (Alaska Supreme Court Order, Mar. 27, 2019).

Board with the best available information.[27] The court first found that the Tribe's argument with respect to the 2019 herring season was moot. It applied the public interest exception to the mootness doctrine and concluded that there is no best available information requirement in the Alaska Constitution, and if there were, such a standard would be non-justiciable.[28]

The court issued a final judgment in May 2021, noting that the Tribe prevailed on its statutory and regulatory claim and the State prevailed on the constitutional claim and that attorney's fees would be discussed at a later date. The parties filed cross-motions for Rule 82 attorney's fees, each claiming prevailing party status. The court "decline[d] to designate any party as the prevailing party" and ordered that "[a]ll parties shall bear their own attorney's fees and costs."

The Tribe appeals the superior court's denial of its constitutional claim, its finding that the Tribe would not suffer irreparable harm in the absence of a preliminary injunction, and its denial of attorney's fees.

## III. STANDARD OF REVIEW

We review questions of constitutional interpretation and summary judgment rulings de novo.[29] We interpret the Alaska Constitution "according to reason, practicality, and common sense," considering the plain meaning, purpose, and framers' intent.[30]

---

**27** In its appeal to us, the Tribe discusses its constitutional argument with reference to apparently different standards: "best available information," "best available scientific information," or "all the relevant information." For clarity we use "all relevant information" in this opinion.

**28** Courts use the public interest exception to the mootness doctrine when the matter is recurrent and important to the public interest but capable of evading review. *Young v. State*, 502 P.3d 964, 970 (Alaska 2022).

**29** *Kohlhaas v. State*, 518 P.3d 1095, 1103 (Alaska 2022).

**30** *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

Decisions to grant or deny a preliminary injunction are generally reviewed for abuse of discretion, but a decision based on issues of law is reviewed de novo.[31] We will reverse a decision based on a legal conclusion if the court "misinterpreted, misapplied, or otherwise acted contrary to the law."[32] Factual findings are reviewed for clear error and reversed only "if, after reviewing the entire record, we are left with a firm and definite conviction that a mistake was made."[33] "A court's legal conclusions about irreparable harm, adequate protection, and the probability of success on the merits of a claim may represent pure questions of law based on undisputed facts or may involve mixed questions of fact and law."[34] The Tribe's claim that the superior court erred by concluding it would not face irreparable harm presents a mixed question of fact and law.[35] If the facts underlying a legal conclusion are in dispute, "the court must first make factual findings to establish the nature and extent of the harm."[36]

"A superior court's prevailing party determination for purposes of attorney's fees is . . . reviewed for abuse of discretion."[37]

## IV. DISCUSSION

### A. The "Hard Look" Doctrine Already Requires Agencies To Consider All Relevant Information.

The Tribe argues that the sustained yield clause in article VIII, section 4 of the Alaska Constitution requires the Department to provide all relevant information

---

[31] *Alsworth v. Seybert*, 323 P.3d 47, 54 (Alaska 2014).

[32] *State v. Galvin*, 491 P.3d 325, 332 (Alaska 2021).

[33] *Id.*

[34] *Id.*

[35] *See id.*

[36] *Id.*

[37] *Alaska Fur Gallery, Inc. v. First Nat'l Bank Alaska*, 345 P.3d 76, 84 (Alaska 2015).

to the Board. It claims that the sustained yield principle requires the "conscious application" of "principles of management," which require that "all the relevant information" be used in the decision-making process.

The Department and the Alliance argue that there is no constitutional duty to provide all relevant information to the Board and that this is a non-justiciable political question.

The sustained yield clause in article VIII, section 4 provides that "[f]ish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses."[38] At the constitutional convention, "sustained yield principle" was used to "denote[] conscious application insofar as practicable of principles of management intended to sustain the yield of the resource being managed."[39] We have previously acknowledged that "the framers of Alaska's constitution intended the sustained yield clause to play a meaningful role in resource management. But at the same time, they believed that calculating a specific numerical yield for fisheries would be impossible."[40] We have concluded that "the sustained yield clause does not require . . . a specific level of yield for each fish stock" and "does not mandate the use of a predetermined formula, quantitative or qualitative."[41]

In *Sagoonick v. State* we considered whether the State had violated constitutional natural resource provisions and residents' individual constitutional

---

[38] Alaska Const. art. VIII, § 4.

[39] *Papers of the Alaska Constitution Convention, 1955-1956*, Folder 210, Terms.

[40] *Native Vill. of Elim*, 990 P.2d 1, 7 (Alaska 1999) (internal citation omitted).

[41] *Id.* at 7-8 (acknowledging that "much scientific uncertainty exists in fisheries management").

rights.[42]  We affirmed the superior court's denial of injunctive relief, reasoning that granting an injunction would "infring[e] on an area constitutionally committed to the legislature, abandoning our 'hard look' standard of review for natural resource decisions, and disrespecting our coordinate branches of government by supplanting their policy judgments with our own normative musings about the proper balance of development, management, conservation, and environmental protection."[43]  We reiterated that the "hard look" doctrine applies "[w]hen an executive agency decision about natural resources is challenged under article VIII."[44]  In such cases we review the decision to "ensur[e] that the agency has 'taken a "hard look" at all factors material and relevant to the public interest.' "[45]

The Tribe argues that requiring the Department to provide the Board with all relevant information is similar, if not identical, to the "hard look" doctrine.  The Alliance responds that "[i]f the question of whether [the Department] has failed to provide [the best available information] or relevant information to the Board can be reviewed under an existing cause of action, within an established analytical framework," then "there is no reason for this court to embrace the Tribe's request to declare a separate, stand-alone constitutional duty."

As an example of the Department's alleged failure to provide all relevant information to the Board, the Tribe asserts that the Department never gave the Board a report that analyzed the Department's current method of forecasting the abundance of spawning herring stock, called an age-structured analysis.[46]  The Department counters

---

[42]  503 P.3d 777, 782 (Alaska 2022).

[43]  *Id.* at 796.

[44]  *Id.* at 788.

[45]  *Id.* (quoting *Sullivan v. Resisting Env't Destruction on Indigenous Lands (REDOIL)*, 311 P.3d 625, 635 (Alaska 2013)).

[46]  DUPUIS ET AL., *supra* note 5, at 3-4.

that "the highly technical . . . report was not particularly relevant and helpful" information for "the Board's consideration[] of changes to 5 AAC 27.160(g)."

The Department is required to analyze complex information.[47] It must rely on the professional judgment of its staff to determine what information to provide to the Board.[48] At the same time the Department incorporates feedback from the Board, based on the Board's experience and expertise, to guide the decisions the Department is required to make. Alaska Statute 16.05.050 grants the Commissioner the responsibility and discretion "to collect, classify, and disseminate statistics, data and information."[49] Deciding what information is relevant and how it is shared is within the Department's discretion.[50] As we have previously explained, our role is to:

> ensure that the agency "has given reasoned discretion to all the material facts and issues." The court exercises this aspect of its supervisory role with particular vigilance if it "becomes aware, especially from a combination of danger signals, that the agency has not really taken a '*hard look*' at the salient problems and has not genuinely engaged in reasoned decision making."[51]

---

[47] *See Cook Inlet Fisherman's Fund v. State, Dep't of Fish & Game*, 357 P.3d 789, 801 (Alaska 2015) (discussing complexity of Alaska's fisheries).

[48] *See West v. State*, 248 P.3d 689, 701 n.66 (Alaska 2010) (quoting *Trustees for Alaska v. State, Dep't of Nat. Res.*, 795 P.2d 805, 809 (Alaska 1990) (stating that "determinations involv[ing] complex subject matter or fundamental policy formulations" are reviewed "only to the extent necessary to ascertain whether the decision has a reasonable basis, . . . was not arbitrary, capricious, or prompted by corruption," and did not "fail[] to consider an important factor in making its decision.") (internal quotations omitted)).

[49] AS 16.05.050(a)(4).

[50] *See id.* (granting Department commissioner discretionary authority "to collect, classify, and disseminate statistics, data and information").

[51] *Sagoonick v. State*, 503 P.3d 777, 788 (Alaska 2022) (quoting *Sullivan v. REDOIL*, 311 P.3d 625, 635 n.46 (Alaska 2013)).

"When an agency decision . . . involves 'administrative expertise as to either complex subject matter or fundamental policy formulations,' the reviewing court need only determine whether the decision had a 'reasonable basis' " and was not "arbitrary, capricious, or unreasonable."[52] An agency decision is arbitrary if the agency "fail[ed] to consider an important factor in making its decision."[53]

The report the Tribe mentions is an independent scientific analysis of the Department's current age-structured analysis model by a professor at the University of British Columbia. The highly technical report primarily consists of equations, charts, and graphs. It is the type of report that the Department scientists distill into summaries and other more easily digested formats for the Board and the Department staff. The report was not directly relevant to the Board's considerations of changes to 5 AAC 27.160(g). It urged changes to the age-structured analysis model to more accurately forecast biomass and better inform the Department's implementation of 5 AAC 27.160(g), which defines the formula for calculating the guideline harvest level; it did not suggest changes to the formula itself.

We review agency decisions such as which scientific reports to provide to the Board "with particular vigilance" to ensure that the agency has taken a "hard look" at the relevant information.[54] "[W]e have often recognized that appeals should ordinarily not be decided on constitutional grounds when narrower grounds are

---

[52] *Denali Citizens Council v. State, Dep't of Nat. Res.*, 318 P.3d 380, 385 (Alaska 2014) (first quoting *Hammond v. N. Slope Borough*, 645 P.2d 750, 758 (Alaska 1982); and then quoting *Ninilchik Traditional Council v. Noah*, 928 P.2d 1206, 1213 (Alaska 1996)).

[53] *Sagoonick*, 503 P.3d at 803 (quoting *Alaska Ctr. for the Env't v. State*, 80 P.3d 231, 241 (Alaska 2003)).

[54] *Id.* at 788.

available."[55]   The hard look standard already requires the Department to consider relevant information and "engage[] in reasoned decision making."[56]  The Department's decision to not provide the report to the Board was not arbitrary because it was a highly technical report mostly concerned with computer coding fixes to the biomass forecasting program.  We therefore decline to create a constitutional requirement that is not in the plain language of article VIII, section 4 of the Alaska Constitution and that would "infring[e] on an area constitutionally committed to the legislature," which the legislature has delegated to the Department and the Board.[57]

B.     **We Decline To Review The Tribe's Motion For A Preliminary Injunction Under The Public Interest Exception.**

The superior court denied the Tribe's motion for a preliminary injunction to prevent the Department from using its allegedly flawed interpretation of 5 AAC 27.195 during the 2019 season.  On appeal the Tribe argues that the superior court erred when it found that the Tribe had not demonstrated that it would face irreparable harm absent a preliminary injunction.  Four years have passed since the 2019 season.  This claim is undoubtedly moot.  The Tribe concedes that it is moot but urges us to consider it under the public interest exception.

"Even when a case is moot, we may address certain issues if they fall within the public interest exception to the mootness doctrine."[58]   Under the public interest exception, we consider "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to

---

[55]     *Alaska Trademark Shellfish, LLC v. State*, 91 P.3d 953, 957 (Alaska 2004).

[56]     *Sagoonick,* 503 P.3d at 803.

[57]     *See id.* at 796; AS 16.05.258; AS 16.05.020.

[58]     *Akpik v. State*, 115 P.3d 532, 535 (Alaska 2005).

the public interest as to justify overriding the mootness doctrine."[59]  The weight given to each of these factors is discretionary, and no single factor is dispositive.[60]  We exercise our discretion whether to review a moot question.[61]

The superior court recognized that "[n]o party disputes the importance" of the subsistence fishery to the Tribe and others but found that "neither test for entry of a preliminary injunction," the balance of hardships test or the probable success on the merits test, had been satisfied.[62]  The Tribe sought a preliminary injunction to prevent the Department from relying on an interpretation of 5 AAC 27.195 that the court later agreed was flawed.  That issue is not capable of repetition.  The now-moot denial of the Tribe's request for a preliminary injunction does not justify application of the public interest exception.

## C.  The Superior Court Did Not Abuse Its Discretion By Declining To Award Attorney's Fees.

The Tribe argues that the trial court erred by not finding it was the prevailing party and awarding it attorney's fees.  Because it prevailed on its statutory and regulatory claims, the Tribe claims that "[t]he court erred when it assumed that the

---

[59]  *Young v. State*, 502 P.3d 964, 970 (Alaska 2022) (quoting *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks*, 48 P.3d 1165, 1168 (Alaska 2002)).

[60]  *See Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 778 (Alaska 2001).

[61]  *Fairbanks Fire Fighters Ass'n*, 48 P.3d at 1168.

[62]  "If the plaintiff faces the danger of irreparable harm and if the opposing party is adequately protected, then we apply a balance of hardships approach in which the plaintiff must raise serious and substantial questions going to the merits of the case," but if the "threatened harm is less than irreparable or if the opposing party cannot be adequately protected, then we demand of the plaintiff the heightened standard of a clear showing of probable success on the merits."  *See Misyura v. Misyura*, 244 P.3d 519, 522 (Alaska 2010) (quoting *State, Div. of Elections v. Metcalfe*, 110 P.3d 976, 978 (Alaska 2005)).

Tribe's constitutional claim was also a main issue."[63]  The Department and the Alliance assert that the constitutional claim was a main issue and the superior court's decision was not manifestly unreasonable or an abuse of discretion.

Civil Rule 82 provides that "the prevailing party in a civil case shall be awarded attorney's fees."[64]  Determining the prevailing party "is committed to the broad discretion of the trial court,"[65] and we review it only for abuse of that discretion.[66]  "[A] trial court does not abuse its discretion in refusing to award fees where neither party can be characterized as the prevailing party."[67]  The party seeking to overturn a trial court's decision "has a heavy burden of persuasion."[68]  "We will not interfere with the trial court's determination unless it is shown that the court abused its discretion by issuing a decision which is arbitrary, capricious, manifestly unreasonable, or which stems from an improper motive."[69]

The Tribe alleged that the Department violated Alaska's subsistence statutes and regulations as well as the common use and sustained yield clauses in article VIII, sections 3 and 4 of the Alaska Constitution.  The superior court granted the Tribe

---

[63]     The Tribe did not assert that it was a constitutional claimant below.  *See* AS 09.60.010(c).

[64]     Alaska R. Civ. P. 82(a).

[65]     *Progressive Corp. v. Peter ex rel. Peter*, 195 P.3d 1083, 1092 (Alaska 2008).

[66]     *Id.*

[67]     *Schultz v. Wells Fargo Bank, N.A.*, 301 P.3d 1237, 1242 (Alaska 2013) (alteration in original) (quoting *Chambers v. Scofield*, 247 P.3d 982, 989 (Alaska 2011)).

[68]     *Id.* at 1241 (quoting *W. Airlines, Inc. v. Lathrop Co.*, 535 P.2d 1209, 1217 (Alaska 1975)).

[69]     *Tobeluk v. Lind*, 589 P.2d 873, 878 (Alaska 1979).

summary judgment on its statutory and regulatory claims and granted the Department and the Alliance summary judgment on the constitutional claim.

The superior court found that the Tribe's success on its claim that the Department violated applicable regulations was "an important decision insofar as it holds the potential to directly alter the allocation of the resource in issue as between subsistence and commercial users," but the court also found that the constitutional claim was of substantial importance. The court concluded that because "[n]one of these parties' victories was on peripheral or unimportant issues[,] [t]he court cannot fairly conclude that any party, or that either side, bested the others to the degree that it can be accurately designated as the prevailing party in the case as a whole."

The Tribe has not met its heavy burden of persuasion to show that the superior court abused its discretion by denying attorney's fees to all parties.

## V.    CONCLUSION

We AFFIRM the superior court's decision.

WINFREE, Chief Justice, concurring in part.

I write separately to clarify that I agree to affirm the superior court's attorney's fees decision based solely on the manner in which it was litigated in the superior court and then presented on appeal. But in my view the Tribe's underlying premise about how AS 09.60.010's "constitutional claimant" framework[1] and Alaska Civil Rule 82[2] interrelate was mistaken, at least with respect to the State.

Presumably recognizing that it was an unsuccessful constitutional claimant and thus unable to obtain an AS 09.60.010(c)(1) attorney's fees award against the State for its constitutional claim, the Tribe contended that Rule 82 applied to the entire litigation, it had prevailed on what it argued was the main issue — the statutory/regulatory claim — and it thus was entitled to an award of attorney's fees based on 20% of its fees incurred in connection with both its statutory/regulatory claim

---

[1]      We discussed the history of AS 09.60.010 and then summarized its effect in *Alaska Conservation Found. v. Pebble Ltd. P'ship*, 350 P.3d 273, 274 (Alaska 2015), referring first to benefit under subsection .010(c)(1) and then to protection under subsection .010(c)(2):

> The statute both encourages and protects those challenging governmental action as a violation of federal or state constitutional rights. First, the statute provides that a successful claimant generally is entitled to an award of full reasonable attorney's fees and costs incurred in connection with a constitutional claim, unless the claimant had "sufficient economic incentive" to bring the claim regardless of its constitutional nature. Second, the statute protects an unsuccessful claimant from an adverse attorney's fees award if the constitutional claim was not frivolous and the claimant did not have "sufficient economic incentive" to bring the claim regardless of its constitutional nature.

[2]      *See* Alaska R. Civ. P. 82(a) ("Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule.").

and its constitutional claim.[3]  The State and the Alliance responded by asking for their own Rule 82 awards of attorney's fees against the Tribe, claiming that they, and not the Tribe, had prevailed on *all* claims.  But, giving a nod to AS 09.60.010(c)(2), they nonetheless agreed that they were required to segregate out their attorney's fees incurred in defending against the Tribe's constitutional claim.  And that is how the attorney's fees dispute was litigated and presented to the superior court.  The parties — using a pure Rule 82 analysis — disputed (1) whether the statutory/regulatory claim and the constitutional claim both were main issues, (2) who might be an overall prevailing party entitled to a fee award, and (3) whether the results essentially were a wash so that the court should exercise its discretion to simply deny an award.  The superior court ultimately determined that the statutory/regulatory claim and the constitutional claim both were main issues and that the Tribe prevailed on the former while the State and the Alliance prevailed on the latter.  It then exercised its discretion to conclude that neither side was the overall prevailing party and no attorney's fees should be awarded.  I cannot fault the superior court for this decision given the way the issue was presented by the parties.

I nonetheless have two concerns about how the attorney's fees issues were litigated.  The first relates to the Tribe's constitutional claim against the State and the application of AS 09.60.010(c)(1)-(2).[4]  The second relates to whether AS 09.60.010(c) can have any application to the Tribe's constitutional claim to the extent it was opposed

---

**3**      *See* Alaska R. Civ. P. 82(b)(2) (setting schedule for awarding 20% of actual reasonable attorney's fees in cases resolved without a money judgment and without trial).

**4**      *See supra* note 1.

-20-                                                          **7679**

by the intervenor-defendant Alliance, perhaps leaving Rule 82 as the controlling authority.[5]

As to my first concern, I believe AS 09.60.010(c)(1)-(2) controls an award of attorney's fees regarding the resolution of a constitutional claim brought against the State, *to the exclusion of Rule 82*.[6]  As both the State and the Alliance appear to have recognized in their motion papers — disclaiming the right to any attorney's fees awards for defending against the Tribe's constitutional claim — the Tribe was a qualified non-prevailing constitutional claimant entitled to protection against an attorney's fees award in favor of the State with respect to its constitutional claim.[7]  That should have been the end-all for *any* consideration of the Tribe's constitutional claim for purposes of an attorney's fees award as between the Tribe and the State.  Specifically, I believe it was legally incorrect for the Tribe to seek Rule 82 attorney's fees against the State for its unsuccessful constitutional claim and equally incorrect for the State to point to its successful defense of the Tribe's constitutional claim to support its assertion of overall prevailing party status.

The Tribe and the State presumably could have asked for a Rule 82 award against the other for prevailing solely on the Tribe's statutory/regulatory claim.  The superior court ultimately determined that the Tribe's statutory/regulatory claim was a

---

[5]     *See Vote Yes for Alaska's Fair Share v. Res. Dev. Council for Alaska, Inc.*, ___ P.3d ___, Op. No. 7674 at 22-29, 2023 WL 8291474, at \*10-13 (Alaska Dec. 1, 2023) (Winfree, C.J., concurring) (suggesting that an attorney's fees award in this context may be controlled by Rule 82 and not AS 09.60.010).

[6]     *See Krone v. State, Dep't of Health & Soc. Servs.*, 222 P.3d 250, 257 (Alaska 2009) (stating that AS 09.60.010 controls attorney's fees award notwithstanding Rule 82).

[7]     *See* AS 09.60.010(c)(2) (regarding protection against award under subsection .010(c)(1)); *Taylor v. Alaska Legis. Affs. Agency*, 529 P.3d 1146, 1160 (Alaska 2023) ("A qualified constitutional claimant is entitled to protection under AS 09.60.010(c)(2) against an attorney's fees award under Rule 82.").

main issue in the litigation and that the Tribe had prevailed on that issue, which alone would have precluded a Rule 82 award for the State. But had the Tribe pursued this tack, it would have been required to eliminate from the equation all of its attorney's fees devoted solely to its constitutional claim, for which it could not obtain an award against the State as a non-prevailing party under AS 09.60.010(c)(1).[8] It did not do so. It instead took a different tack in an effort to obtain a Rule 82 award against the State based on *all* of its attorney's fees. The issue was presented to the superior court as a typical Rule 82 discretionary decision made by comparing the relative significance of the main issue upon which each party had prevailed. Acting on this presentation, the superior court exercised its discretion to determine that both issues were significant and the parties' relative successes were a wash. I agree that the superior court did not abuse its discretion by making that ruling based on the arguments of the parties.

My concern about the application of this framework to the Alliance's defense of the Tribe's claims is different. I question whether AS 09.60.010(c) can have any application when two private parties litigate a claim involving constitutional interpretation. It is beyond dispute that a private party generally has no claim against another private party for an alleged constitutional violation.[9] This suggests that, as to

---

[8] *See Manning v. State, Dep't of Fish & Game*, 355 P.3d 530, 538-40 (Alaska 2015) (addressing allocation problems arising from litigation involving both constitutional and non-constitutional claims and the relationship between AS 09.60.010 and Rule 82); s*ee also Meyer v. Stand for Salmon*, 450 P.3d 689, 690-91 (Alaska 2019) (addressing allocation problems arising from litigation involving multiple constitutional claims when claimant prevails on less than all the claims); *id.* at 692-93 (Winfree, J., concurring) (discussing allocation issues in *Manning* and *Lake & Peninsula Borough Assembly v. Oberlatz*, 329 P.3d 214 (Alaska 2015)).

[9] *Vote Yes for Alaska's Fair Share*, Op. No. 7674 at 22 n.2, 2023 WL 8291474, at *10 n.2 (Winfree, C.J., concurring) (noting long-standing legal principle that constitutions protect individuals from state action, citing relevant Alaska caselaw, and querying how private party could be an AS 09.60.010 "constitutional claimant" against another private party).

the claims between the Tribe and the Alliance, the parties' Rule 82 analysis about determining prevailing party status with multiple main issues was correct. But again, as suggested to the superior court by the Alliance, the superior court determined that because the Tribe prevailed on one main issue and the Alliance prevailed on the other, no fee award was warranted. I agree that the superior court did not abuse its discretion by making that ruling.

I therefore concur with today's decision.